# Wytheville.

## CITY OF RICHMOND V. VIRGINIA BONDED WAREHOUSE CORPORATION
and
## VIRGINIA BONDED WAREHOUSE CORPORATION V. GRINNELL CO., INC.

June 16, 1927.

Absent, Prentis, P.

1. MUNICIPAL CORPORATIONS—*Liability for Negligence—Exercise of Govern mental, Legislative or Discretionary Powers.*—A municipal corporation is not liable for the failure to exercise, or for the negligent or improper exercise of its governmental, legislative or discretionary powers, nor is it liable for the *ultra vires* acts of its servants.

2. MUNICIPAL CORPORATIONS—*Liability for Negligence—Exercise of Proprietary or Ministerial Powers.*—For failure to exercise, or for negligence in the exercise of those powers and privileges which are conferred upon a municipality for its private advantage, usually called "proprietary" or "ministerial," the municipality is liable in the same manner as a private individual.

3. MUNICIPAL CORPORATIONS—*Liability for Negligence—Fire Department.*— The organization and operation of a fire department for the extinguishment of fires is a governmental function for the defects or negligent operation of which the municipality is not liable, and, furthermore, it is not liable for the loss or destruction of buildings because of an inadequate supply of water, or for a failure to extinguish fires.

4. MUNICIPAL CORPORATIONS—*Water Works—Liability for Negligence— Operation of Water Department—Water Used for the Extinguishment of Fires.*—The operation of a water department of a municipality for the purpose of supplying water for domestic and commercial purposes is a private or proprietary right, and for negligence in such operation a municipality is liable in like manner as a private individual. The fact that the water is also used for the extinguishment of fires does not change the result.

5. MUNICIPAL CORPORATIONS—*Water Works—Liability for Negligence— Operation of Water Department—Water used for the Extinguishment*

*of Fires.*—A characteristic example of a function undertaken by cities and towns in their private or proprietary capacity is the distribution of water to their inhabitants for domestic purposes. Such a function is one that is often performed by private water companies, and when assumed by a municipal corporation it is a purely commercial transaction between the municipality as a dealer and the citizen as a customer. It is accordingly well settled that a municipal corporation is liable for the negligence of its employees in connection with its water department, to the same extent as a private company, notwithstanding that the municipality uses the water system for the extinguishment of fires.

6. MUNICIPAL CORPORATIONS—*Liability for Negligence—Water Works—Sprinkler System—Case at Bar.*—In the instant case, an action by a warehouse company against a city for damages for the flooding of its warehouse through the mistake of a city employee in failing to cut off the water from the warehouse, upon the installation of a sprinkler system, it was argued that furnishing water for a sprinkler system belongs to the fire department of the city and not to its water department, and therefore, the city was not liable. The object of the installation of the sprinkler was the private benefit to be obtained by the plaintiff, and not to aid the city in preventing or extinguishing fires. The work to be done appertained to the city water department, and the negligence proved was that of an employee of that department. The city, therefore, could not defend on the ground that the negligence occurred in the exercise of a governmental power.

7. MUNICIPAL CORPORATIONS—*Water Works—Flooding Warehouse—Case at Bar.*—In the instant case, a warehouse company employed an independent contractor to install a sprinkler system in one of his warehouses. Water for the use of the new sprinkler system was obtained from a warehouse of the company in which the sprinkler system was already installed. When the contractor was ready to connect the water with the new sprinkler system, he notified the warehouse company and asked it to request the city to cut off the water at the other warehouse so that he could make the connection without flooding that warehouse. This the warehouse company did, and the city sent an employee to cut off the water. This employee, through mistake, turned off a dead valve which had no connection with any of the pipes and thereupon the warehouse company informed the independent contractor that the city man said that the water had been cut off; as a result when the pipe in the other warehouse was cut to make the connection, the warehouse was flooded with water. The plaintiff was damaged upwards of $12,000, for which the present action was brought. The use and operation of the water pipes in the city streets were under the city's exclusive management and control.

The question of whether or not the city was negligent was submitted to the jury under instructions as favorable to the city as it could expect and the jury found that the city was negligent.

*Held:* That there was abundant evidence to support the verdict.

8. Municipal Corporations—*Water Works—Liability of City for Negligence—Flooding Warehouse—Contributory Negligence—Case at Bar.*— In the instant case, an action for damage by a warehouse company against a city for the flooding of its warehouse, through the negligence of an employee of the city water department in failing to turn off the water from the warehouse when requested, the city contended that the warehouse company was guilty of contributory negligence, because when the warehouse sprinkler system was installed, the shut-off valve was marked "city sewer" instead of "city water works," and when the warehouse company obtained permission to extend the sprinkler service across the street to another warehouse, it violated the Richmond City Code by locating the shut-off valve in front of the first warehouse instead of in front of the warehouse to which the service was to be extended. The record clearly showed that the city did the original installation of the service pipe, valves, etc. The regulations of the water department provided that the superintendent of waterworks should have full control of pipes, valves and location in the streets and should do the work and charge the costs thereof to the applicant for any special service. The damage arose from the employee of the city water department turning a dead valve when requested to turn off the water instead of the cut-off valve.

*Held:* That the warehouse company was not guilty of contributory negligence.

9. Independent Contractors—*Negligence—Contributory Negligence—Installation of Sprinkler System—Case at Bar.*—In an action by a warehouse company against a city for the flooding of its warehouse through the negligence of an employee of the city water department, the city relied on the contributory negligence of the warehouse company. The warehouse company was installing a sprinkler system through an independent contractor. This contractor requested the warehouse company to have the city cut off the water from the warehouse, but through the negligence of the employee of the city the water was not cut off, although the city informed the warehouse company that it had been cut off. The failure of the independent contractor to make a simple test to ascertain if the water had been cut off was relied upon by the city to show contributory negligence on the part of the warehouse company.

*Held:* That the warehouse company was not liable for the negligence of the independent contractor.

10. MUNICIPAL CORPORATIONS—*Water Works—Liability of City for Negligence—Flooding Warehouse—Contributory Negligence—Case at Bar.*—An independent contractor engaged in installing a sprinkler system for a warehouse company had the right to accept as true the city's own statement of a fact about a matter peculiarly within its knowledge, viz: That the water had been cut off from the warehouse. The city was chargeable with the knowledge of the location of its water pipes and was asked to cut the water off from the warehouse and sent an experienced employee to cut off the water.

   *Held:* That the independent contractor had the right to accept as true, in an action against the city, the statement of the city that the water had been cut off and was not obliged to make a test to ascertain whether it had been cut off.

11. MUNICIPAL CORPORATIONS—*Water Works—Liability of City for Negligence—Release by Applicant for Service—Case at Bar.*—The instant case was an action by a warehouse company against a city for negligence in reporting that the water had been cut off from its warehouse when it had not been cut off. The warehouse company was extending its sprinkler service from one warehouse to another and the city granted it permission to do so on condition that the warehouse company should indemnify and save harmless the city from any charge, damage or cost by reason of any person being injured or damaged by the operation. The line from which the city was asked to cut off the water was totally unconnected with the line for the installation of which this permission was obtained. If there was any confusion as to the location of the cut-off, it was the city's own fault.

   *Held:* That the release was no defense to the action against the city.

12. MUNICIPAL CORPORATIONS—*City Contracting Against its Own Negligence—Negligence of City—Release by Applicant for Special Service—Case at Bar.*—In the instant case, a warehouse company obtained permission from a city to extend its sprinkler service from one warehouse to another across the street. This permission was granted on condition that the warehouse company would indemnify and save harmless the city from any charge, damage or cost that the city might be required to pay by reason of injury to any person by the laying, existence or use of the pipes.

   *Held:* That negligence on the part of the city was not in contemplation of the parties to the release, and that the city had not contracted against its own negligence, even if it could have done so.

13. INDEPENDENT CONTRACTORS—*Installation of Sprinkler Systems—Duty of Contractor to Test Statement of City that Water had been Cut Off at the Warehouse—Case at Bar.*—The instant case was an action by a warehouse company against an independent contractor employed to install a sprinkler system in plaintiff's warehouse. The independ-

ent contractor contracted to do the expert work in an expert manner and did it. In the course of the work it became necessary to have the water cut off. The contractor did not assume the responsibility of doing this but informed the president of the warehouse company and asked him to have it cut off and the president assumed the responsibility of having it done and requested the city to cut off the water. The independent contractor relied on the report of the city that the water had been cut off and that he might go ahead and make his connections.

*Held:* That this was all the case required of the independent contractor and that he did not have to test and verify the correctness of the statement by the city that the water had been cut off, such test being not required by his contract nor by custom.

14. Appeal and Error—*Demurrer to the Evidence—Inferences.*—Where an appellant is before the Supreme Court of Appeals as on a demurrer to the evidence by it, every inference which a jury might have fairly drawn from the evidence in favor of the appellee, must be drawn by the Supreme Court of Appeals.

15. Appeal and Error—*Instructions—Where no other Verdict Could have been Found.*—Where under correct instructions the jury could not have found any other verdict than it did find, it is immaterial what, if any, errors were contained in the instructions given.

. Error to a judgment of the Law and Equity Court, Part Two, of the city of Richmond, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*James E. Cannon, R. T. Lacy, Jr.,* and *L. F. Cary,* for the plaintiff in error.

*Leake, Leake & Spicer, Scott, Lloyd & Scott,* and *Parrish, Butcher, Churchman & Coulbourn,* for the defendant in error.

Burks, J., delivered the opinion of the court.

The Virginia Bonded Warehouse Corporation brought an action of trespass on the case against the city of

Richmond and the Grinnell Company, Incorporated, to recover damages for negligently flooding the warehouse of the plaintiff. There was a verdict and judgment in favor of the plaintiff against the city of Richmond for $12,252.39, and in favor of the Grinnell Company against the plaintiff. There is only one record, but two petitions and two writs of error—one granted the city of Richmond to the judgment against it, and the other to the Virginia Bonded Warehouse Corporation, to the judgment in favor of the Grinnell Company on the merits, and for its costs. The two cases were argued together.

Each of the plaintiffs in error stands in this court practically as on a demurrer to the evidence, and the case will be stated from that standpoint.

So far as the liability of the city of Richmond is concerned, the facts are, in the main, as stated in the brief of counsel for the Warehouse Company. The facts are that the plaintiff, Virginia Bonded Warehouse Corporation, is a corporation organized and existing under the laws of the State of Virginia, and is engaged in the business of a warehouseman in the city of Richmond. On and prior to the 17th day of September, 1923, the plaintiff owned and operated three warehouses on Cary street between Seventeenth and Eighteenth streets, in the said city; which warehouses were commonly known, and will be designated, as Warehouse A, Warehouse B and Warehouse C. Warehouses A and C were adjoining buildings, located on the north side of Cary street, which street runs east and west, and Warehouse B was located across Cary street on the south side. In these warehouses, prior to the aforesaid time, the plaintiff had received at different times from sundry persons, firms and corporations, large quantities of goods, wares and merchandise for storage and safekeeping, in return

for which it received a compensation in money as rates and charges for the safekeeping of said goods, and for which the plaintiff had issued and delivered to the persons so storing such goods its receipts commonly known as warehouse receipts. Some years prior to September 17, 1923, the plaintiff had installed in its Warehouse A an automatic sprinkler system known as the Grinnell Automatic Sprinkler System. This sprinkler system was supplied with water from the water works of the city of Richmond by means of a six-inch supply pipe leading from the premises of Warehouse A to the city main in the middle of Cary street. On the roof of Warehouse A was a 30,000 gallon tank which was also connected with the sprinkler system in the warehouse. At this time Warehouse C, adjoining Warehouse A on the west, was without a sprinkler system. As a consequence, the insurance premiums on this building were most costly, and in addition there were many persons who were unwilling to risk the fire hazard and who refused to have their goods stored in such a warehouse. The result was that the plaintiff resolved to install an automatic sprinkler system in Warehouse C for its own peculiar private benefit. Accordingly, on the 14th day of May, 1923, the plaintiff entered into a contract with the Grinnell Company, of Providence, R. I., a corporation engaged in the manufacture and installation of their own sprinkler systems, for the installation of an automatic sprinkler system in Warehouse C. Under the terms of the contract the Grinnell Company was to do the work as an independent contractor. It took entire and complete control over the work of installation and left nothing to be performed by the plaintiff. The plaintiff contracted for a "turn-key" job.

The Grinnell Company agreed to perform its contract on the basis of expert knowledge and skill, and

for such a standard of care and prudence the plaintiff agreed to pay the sum of five thousand two hundred and fifteen dollars. The Grinnell Company planned to have the sprinkler system they were installing in Warehouse C supplied with water from the same supply pipe which supplied the system already in Warehouse A, and which ran from the premises to the city main in Cary street. In order to do this, it would become necessary to substitute for the "L" or "elbow" pipe, which was then serving Warehouse A, a "T" or double connection pipe. The place decided upon by the Grinnell Company to sever the connection, as being the most practical and convenient, was a point on the premises of Warehouse A, in a room mentioned in the evidence as the "valve room," and the pipe to be severed was the six-inch supply pipe, previously mentioned, leading from Warehouse A and connecting the several pipes comprising the sprinkler system in said warehouse with the city water main in Cary street. The water in said pipe, directly connected with the city main, was under a pressure of eighty-five pounds to the square inch. On Friday, the 14th day of September, the Grinnell Company had progressed so far with its work that nothing remained to be done except to connect the sprinkler system just installed in Warehouse C with the city water supply. In order to do this as planned by the Grinnell Company, it then became necessary to have the city water coming from the main in Cary street into Warehouse A, by means of the six-inch supply of service pipe, cut off, so that when the said pipe was severed there would be no flood of water to damage the goods in Warehouse A. This could only be done by operating a "cut-off" valve installed by the city of Richmond in Cary street in front of Warehouse A. This cut-off valve, as well as the supply pipe leading into Warehouse A, which it regulated, was

installed by the city of Richmond, and both were under the exclusive control of the city. Accordingly, on the said Friday, the Grinnell foreman requested Mr. Hoadley, president of the plaintiff corporation, to have the city water department cut off the water coming into Warehouse A. As the proper cut-off valve was in the city streets, no one but the city of Richmond had the right to cut off the city water. Mr. Hoadley called up the water department, and after some delay and several unfilled promises by the persons he talked to, on Saturday, September 15th, he finally got in touch with Mr. Trafford, the then Director of Public Utilities and head of the city water department, personally, over the 'phone. Mr. Hoadley explained to Mr. Trafford that he was having installed an automatic sprinkler system in Warehouse C, which was to be supplied from the city water system from the same service pipe that was supplying Warehouse A; that the service pipe leading into Warehouse A was to be severed; and that consequently he wanted the city to send some one to cut off the city water leading into the service pipe of Warehouse A. As a result, at the direction of Mr. Trafford, on Monday, September 17th, one Lucas, an employee of the city water department, came to the warehouse to cut the water off. They went to a valve in the street and attempted to turn off the water, but found the key they had brought was too short. Whereupon, they went to a nearby fire engine house and returned with a longer key, with which they thought they had turned off the water going into Warehouse A. It later transpired that this was a "dead" valve, having, so far as the evidence shows, no connection with any pipes. At any rate, they reported to a Mr. Carter, superintendent of the plaintiff, that the water was cut off and that they would, when desired, return and turn it back on.

Thereupon, Carter went to the Grinnell employees and told them that the city men said the water had been cut off.

Relying upon this information, the employees of the Grinnell Company proceeded to make the desired connection. It developed that the employees of the city had, by mistake, turned the wrong valve, and had not cut the water off, and, as a result, when the pipe in Warehouse A was cut by the employees of the Grinnell Company that warehouse was flooded with water, and the plaintiff was damaged upwards of $12,000, for which this action was brought.

Numerous errors are assigned by the city of Richmond, but it is said in its petition for a writ of error that: "These several assignments of error will not be taken up and discussed *seriatim*, for the reason that many of these overlap and therefore needless repetition would ensue. It is believed that the issues involved can best be presented to your honors by an analysis of the grounds assigned in petitioner's motion to dismiss, as follows: First. The evidence clearly shows that, in offering to the plaintiff free of charge the facilities for preventing the inception and spread of fire, petitioner was exercising a governmental function for the improper exercise of which petitioner cannot be held liable in damages. Second. That the evidence clearly shows that petitioner was not guilty of negligence in attempting to shut off the water at plaintiff's request. Third. That the evidence clearly shows that the plaintiff and its agents (including Grinnell) were guilty of contributory negligence for which there can be no recovery. Fourth and Fifth. That the evidence clearly shows that the injury complained of was caused by the intervening and superseding negligence of Grinnell, and that the alleged negligence of petitioner was not the

proximate cause thereof. Sixth. That the evidence clearly shows that the injury complained of was occasioned by the improper and unlawful laying, existence and use of the main leading from Warehouse A to Warehouse C, and that all loss and damage occasioned thereby were released by the express terms of the ordinance of October 23, 1914, which authorized the installation of said main. This analysis will necessarily involve a discussion of the evidence and of the instructions refused and those given over petitioner's objection.''

[1-3] A municipal corporation is not liable for the failure to exercise, or for the negligent or improper exercise of its governmental, legislative or discretionary powers, nor is it liable for the *ultra vires* acts of its servants. But for failure to exercise, or for negligence in the exercise, of those powers and privileges which are conferred upon it for its private advantage, usually called proprietary or ministerial, the municipality is liable in the same manner as a private individual. *Jones* v. *Williamsburg,* 97 Va. 722, 34 S. E. 883, 47 L. R. A. 294. This was very properly conceded by counsel for the defendant in error. It was also conceded that the organization and operation of a fire department for the extinguishment of fires is a governmental function for the defects of negligent operation of which the municipality is not liable, and, furthermore, that it is not liable for the loss or destruction of buildings because of an inadequate supply of water, or for a failure to extinguish fires. It is unnecessary, therefore, to cite cases on the subject.

[4] But the operation of a water department for the purpose of supplying water for domestic and commercial purposes is a private or proprietary right, and for negligence in such operation a municipality is liable in like

manner as a private individual. The fact that the water is also used for the extinguishment of fires does not change the result. The cases so holding are too numerous to cite without unduly burdening this opinion.

[5] In 19 R. C. L., page 1130, the law on the subject in succinctly stated, and many cases, supporting and illustrating the text, are cited. It is there said: "A characteristic example of a function undertaken by cities and towns in their private or proprietary capacity is the distribution of water to their inhabitants for domestic purposes. Such a function is one that is often performed by private water companies, and when assumed by a municipal corporation it is a purely commercial transaction between the municipality as a dealer and the citizen as a customer. While an ample supply of fine water doubtless enhances the public health, this result is merely incidental, and the primary object of a city or town in securing a water supply is to increase the comfort and convenience of its own inhabitants. It is accordingly well settled that a municipal corporation is liable for the negligence of its employees in connection with its water department to the same extent as a private company. The mere fact that a municipal corporation uses its water works system for the extinguishment of fires as well as for the distribution of water for domestic purposes, does not exonerate it from liability for an injury arising from negligence in the management of its water works not directly connected with the extinguishment of fires." To the same effect, and citing many other cases, see McQuillin Mun. Corp., page 5414; 24 A. L. R., at page 545; *Wigal v. City of Parkersburg*, 74 W. Va. 36, 81 S. E. 558.

The following cases in this State, though not directly in point, bear upon the liability of municipal corpora-

tions for acts done in their private or proprietary capacity: *Sawyer* v. *Corse*, 17 Gratt. (58 Va.) 230, 241, 94 Am. Dec. 445; *Noble* v. *Richmond*, 31 Gratt. (72 Va.) 271, 278, 31 Am. Rep. 726; *Petersburg* v. *Applegarth*, 28 Gratt. (69 Va.) 321, 343–4, 26 Am. Rep. 357; *Orme* v. *Richmond*, 79 Va. 86, 89; *Chalkley* v. *Richmond*, 88 Va. 402, 14 S. E. 339, 29 Am. St. Rep. 230; *Va. Western P. Co.* v. *Clifton Forge*, 125 Va. 469, 498, 99 S. E. 723, 9 A. L. R. 1148.

[6] Counsel for the city of Richmond seek to avoid the effect of the authorities cited by arguing that furnishing water for a sprinkler system belongs to the fire department of a city and not to its water department. The negligence alleged and proved was the ministerial act of an employee of the city water department in failing to cut off the water. That department, and not the fire department, was charged with the duty of cutting off the water, and it was through the negligence of an employee of that department that it was not cut off.

The suggestion is also made that the object of the sprinkler was to prevent fires, and that the public was interested as well in preventing fires as in extinguishing them after they have started; that no charge was made for the water used by the sprinkler in extinguishing fires, and hence the act of the city in furnishing water to the sprinkler should be classed as a governmental act in like manner as the acts of the fire department. But the interest of the public was too remote to justify such a classification. All water on premises is some protection against the spread of fire, and in many of the large buildings there are stand pipes, several inches in diameter, with hose attached, and running to the tops of the buildings, and yet it has not been suggested that they constitute any part of the fire apparatus of the city. They are put there and maintained for the

private benefit and interest of the owner of the building. Such installations, when not required under police regulations, are made by municipalities in their private or proprietary capacity.. In the instant case, the sprinkler was being installed by the plaintiff for its private protection against fire. It reduced its insurance, and increased its patronage by giving its patrons assurance of greater safety from fires. It was in no sense for the public security, although the public might ultimately reap a benefit from it. It was not installed by the compulsion or at the instance of the city. The city had a right to charge for the water used by the sprinkler, and the fact that it did not is no answer to the charge of negligence of the city resulting in the damage of the plaintiff. Even a volunteer or a stranger is liable for an injury negligently inflicted on the person or property of another.

In *Keystone Investment Co.* v. *Metropolitan U. District*, 113 Neb. 135, 202 N. W. 416, 37 A. L. R. at page 1509, speaking of the private nature of sprinklers, it is said: "The evidence shows that the standpipe and automatic sprinkler systems installed in the larger buildings afford an added measure of fire protection to the owners and occupants of such buildings as is not enjoyed by the public at large, and is not enjoyed by the property owners in whose buildings such systems are not installed; that the installation of such private systems of fire protection lessens the cost of fire insurance on such buildings and on their contents to an amount equal to or in excess of the charge of defendant for standpipe service, and that such added fire protection makes offices in the buildings more desired by tenants, and enhances the rental value of such buildings."

See also *Gordon* v. *Doran*, 100 Minn. 343, 111 N. W. 272, 8 L. R. A. (N. S.) 1049; *Edgerly* v. *Ottumwa*, 174 Iowa 205, 156 N. W. 388.

The object of the installation of the sprinkler was the private benefit to be obtained by the plaintiff and not to aid the city in preventing or extinguishing fires. The work to be done, in the instant case, appertained to the city water department, and the negligence proved was that of an employee of that department. The city, therefore, cannot defend on the ground that the negligence occurred in the exercise of a governmental power.

[7] In the light of the facts stated, it is unnecessary to comment at any length on the position taken by the city that it was not negligent. The use and operation of the water pipes in the city streets were under its exclusive management and control. No one could cut off the water from the city mains except the city, or those authorized by it. The city knew, or ought to have known, the location of its pipes. It was asked to cut the water off from the pipe which supplied Warehouse A, and the reason for the request was explained to it. It undertook to do so, but failed. Whether or not this was negligence on the part of the city was submitted to the jury upon instructions as favorable to the city as it could expect, and the jury found that the city was negligent. There was abundant evidence to support the verdict.

[8] The city further denies liability on account of contributory negligence of the plaintiff. The contributory negligence, in part, is stated as follows: "When plaintiff furnished the equipment necessary to the installation of the sprinkler system in Warehouse A, said equipment was of such character that the valve was located adjacent to petitioner's main instead of near the curb

in front of the warehouse, and the cap to the meter box
over plaintiff's six-inch supply pipe was marked 'City
Sewer' instead of 'City Water Works.' If petitioner
was guilty of negligence in not ascertaining these facts,
plaintiff was equally guilty of negligence in creating
the condition.

"Similarly, when plaintiff procured permission to ex-
tend the service from A across the street to B, it violated
chapter 31, section 10, Richmond City Code of 1910, by
locating the shut-off valve to this extension in front of
Warehouse A instead of in front of Warehouse B, and
thereby created a situation which must inevitably ex-
onerate petitioner from the charge of negligence or else
convict plaintiff of contributory negligence."

The record clearly shows that the city did the orig-
inal installation of the service pipe, valves, meters
and covers. The plaintiff was required to pay the
costs but the city was to do the work, so that if there
was any misplacing of valves, cut-offs or covers, it was
the city's fault. Section 3 of its own rules and regu-
lations provides that "The superintendant of water
works shall have the pipe and its connections made, so
far as they are located in the street, and cost of such
work shall be paid by the applicant for any such special
service. The size of any such connection shall be sub-
ject to the approval of the superintendent of water and
the committee on water." Section 4 provides that, "All
valves for the control of such connections shall be
located in such positions that they can be operated
outside the premises."

Section 8 provides that, "*The location of all special
pipe connections, the size of the pipe, the proper kind and
location of all valves, meters, etc., and the class of all materi-
als to be used is subject to the approval of the superin-
tendent of water works and the committee on water.*"
(Italics ours.)

That these regulations were followed, sufficiently appears from the testimony of witnesses in the case. The service pipe from Warehouse A to Warehouse B was not involved in the case. The cut-off valve for Warehouse A was properly located. But even if the said service valve had been involved, the same remarks as to the work done in the streets would apply as have been stated.

[9] The contributory negligence really relied on by the city as exempting it from liability was the failure of the Grinnell Company "to make the simple test to ascertain if the water had been effectually cut off." It is argued that the Grinnell Company was the agent of the plaintiff, and, if so, its negligence was the negligence of the plaintiff, but, if not agent, it was an independent contractor, and, if so, its superseding and intervening negligence was the proximate cause of the injury, and the city was not liable.

It is clear from the evidence that the Grinnell Company was an independent contractor for whose negligence, under the facts of the case, the plaintiff was not liable to the city, and this feature of the case may be dismissed from further consideration.

[10] The other feature of this assignment presents the novel proposition that the Grinnell Company was negligent because it failed to accept as true the city's own statement of a fact about a matter peculiarly within its knowledge. The city is estopped from setting up such a defense. It is an effort to set up a "last clear chance" doctrine, when the Grinnell Company did not know and was not chargeable with knowledge that the statement of the city's employee was untrue. The city was chargeable with knowledge of the location of its water pipes. It was asked to cut the water off from Warehouse A, and knew for what purpose it was to be

cut off.  It sent an experienced employee to cut off the water and he reported to the superintendent of the plaintiff that "he had cut the water off, that they go ahead and make the connection," and the superintendent immediately gave this information to the employees of the Grinnell Company, and they acted on it. To say that the Grinnell Company had no right to accept and act upon the truth of this statement as against the city, but should have made a test to ascertain "if the water had been effectually cut off," is not to be considered.  It would demand a degree of care contrary to human experience and not required by law.  Certainly, so far as the city is concerned, the Grinnell Company was under no obligation to make the investigation, and its failure to do so was not negligence.

[11, 12] It is assigned as error that the trial court rejected a special plea of release tendered by the city. This plea is based upon an ordinance of the city adopted when permission was granted the plaintiff to extend its sprinkler service across Cary street from Warehouse A to Warehouse B, and is as follows:  "Said permission is granted subject to the condition that said Virginia Bonded Warehouse Corporation, or any subsequent owner of the factory now erected, will indemnify, reimburse and save harmless the city of Richmond from any charge, damage or cost that the city may be required to pay by reason of any person being injured or damaged in any way, in property or person, by the laying, existence or use of said pipes."

The line from which the city was asked to cut off the water was the line connecting the water main in Cary street with Warehouse A, totally unconnected with the line from Warehouse A to Warehouse B, and the ordinance quoted was irrelevant to the question at issue.  Furthermore, if there was any confusion as to

the location of the cut-off between Warehouses A and B, it was, as hereinbefore pointed out, the city's fault. It is an all-sufficient answer, however, to this assignment of error to say that negligence on the part of the city was not in the contemplation of the parties, and that the city had not contracted against its own negligence, even if it could have done so. Cf., *Wright* v. *City of Richmond*, 146 Va. 835, 132 S. E. 707. It was not error to reject the plea.

[13, 14] The Virginia Bonded Warehouse Corporation has assigned as error the refusal of the trial court to set aside the verdict of the jury as to the Grinnell Company, Incorporated, as without evidence to support it, and the rulings of the trial court on instructions.

There was abundant evidence to support the verdict, and the trial court could not, with propriety, have set it aside for lack of such evidence. On this question, the Warehouse Company is here as on a demurrer to the evidence by it, and every inference which a jury might have fairly drawn from the evidence in favor of the Grinnell Company must be drawn by this court. Even upon the testimony for the plaintiff, the verdict in favor of the Grinnell Company could not be set aside.

Hoadley, president of the warehouse company, testified as follows:

"Q. Now when they were ready to make the connection in Warehouse A with the supply pipe, after they had completed, as you said, the installation of the other portions of the system, what did they do and what did you do?

"A. Their foreman came over to the office and told me that they were ready to make the connection in the sprinkler room, which required shutting off the water by the city, and would I arrange with the city to have

the water cut off on the following Saturday, which I think was the 15th of September, 1923. I called up the city water department and explained to them in detail what was required and why it was required, and they said they would be down Saturday morning to cut off the water. * * * They didn't show up on Saturday. I was a little upset and provoked about it because everything was set and they were ready to go ahead and it was a short day. I wanted to get it done. So I got on the 'phone again and insisted on getting in touch with Mr. Trafford himself, who was in charge of the gas and water departments, as I understood, of the city. That wasn't very much pleasure because he didn't want to come to the 'phone; he was a very hard man to get hold of by 'phone or any other way. Nevertheless, he did come to the 'phone. I explained that they said they would come there Saturday and they hadn't come, that the city had not done what it said it would do on Saturday, and therefore I appealed to him as head of the department to do the work on Monday. I explained that it was a matter of making the connection from Warehouse A to Warehouse C, putting in a new sprinkler system at Warehouse C; that it was necessary to connect with the old system in A, and it could not be done unless the city turned off the water from their main. He reluctantly promised to have it done Monday, and he did it. * * * On Saturday I told our superintendent, Mr. Carter, what I had arranged, that the city would probably be down there a little earlier than I would, which turned out to be a fact, although we were very near the same time; and when the city performed the function of cutting off the water, for him to report what the city had done to the Grinnell people. Then, as heretofore described, they attempted to make the connection, and the water was

not cut off, causing the flow and the damage to the goods on storage.

"Q. Who is Mr. Carter?

"A. Superintendent of the warehouse.

"Q. Your superintendent?

"A. Mine.

"Q. You told him to report what the city did to the Grinnell Company, did you?

"A. Exactly."

He further testified that, when everything was ready to make the connection, the foreman of the Grinnell Company came over and asked him to make the necessary arrangement with the city to cut the water off, and that, in reply to that request, he said "All right and did it." He informed Carter, his superintendent, of the arrangement made with the city for cutting the water off and told him that when the city men came down on Monday and reported that the water had been turned off to report the fact to the Grinnell people so that they could go on with the work, and Carter says that when the city people reported to him that the water had been cut off and that they could go ahead and make the connection, he told the foreman of Grinnell Company, "that the city people said they had cut the water off and to go ahead and make his connection." The foreman of the Grinnell Company, relying upon this information, proceeded to make the connection, which resulted in flooding the warehouse because the city water had not in fact been cut off. It was not customary to make any test to prove the truth of the statement of the city people that the water had been cut off, and no such test was made. The city alone had the right to turn the water off and on the city main, and Hoadley says that he "relied on the city to turn the water off." He made no suggestion to the Grin-

nell people "about making any test to check up on the
city." Each of them relied on the correctness of the
information furnished by the city people.

The Grinnell people contracted to do the expert work
in an expert manner, and did it. There is no com-
plaint on this score. The sole complaint is that it did
not make any test to ascertain if the report of the city
employee was correct. It is conceded that such a test
could have been made, and that, if it had been, it
would have disclosed the fact that the water had not
been cut off. But where such a test is not required
either by custom or by contract, it is not necessary.
In the instant case, it was not required by contract, and
the evidence is that it was not customary to make it.
When everything was ready to make the connection,
the Grinnell people did not assume the responsibility
of having the water cut off, but informed the president
of the warehouse company of the situation, and asked
him to have it cut off, and he assumed the responsibility
of having it done. He "relied on the city to turn the
water off" and the Grinnell Company relied on the re-
port of his superintendent that the city people said
"they had cut the water off and to go ahead and make
his connection." This was all the care required of the
Grinnell Company. It was not required to exercise
meticulous care, but only ordinary care. The city
alone had the right to cut the water off, and when its
employees reported the water had been cut off, the
Grinnell Company had the right to rely upon that re-
port. Business could not be conducted if every one
had to act only on personal knowledge of every fact
that entered into the basis of his action, or if he had to
test or verify the correctness of statements or reports
which came from a proper and reliable source.

[15] We are of opinion that under correct instructions

the jury could not have properly found any other verdict than it did find as to the Grinnell Company, and where that is true, it is immaterial what, if any, errors were contained in the instructions.   *N. Y., &c., R. Co. v. Bundick,* 138 Va. 547, 122 S. E. 261, and cases cited.

We find no error in the judgment of the trial court, either as to the city of Richmond or the Grinnell Company, Incorporated, and it will be affirmed.

*Affirmed.*