MRS. ANTONIE KLINGENBERG v. THE CITY OF RALEIGH.

(Filed 15 December, 1937.)

1. **Municipal Corporations §§ 12, 14—Municipality may not be held liable for danger inherent in plan of construction of streets.**

   While municipalities may be held liable for injuries resulting from negligence in the construction of streets, and for negligence in failing to exercise due care to keep them in reasonable repair, a municipality may not be held liable for danger inherent in the original plan of construction of a street, either adopted by the municipality or ratified by it after its construction, since the adoption of a plan of construction is an exercise of a legislative, quasi-judicial, and discretionary function of the city.

2. **Same—City held not liable for injury resulting from existence of gutter across street constructed to take care of surface water.**

   The evidence disclosed that defendant municipality determined that catch basins and a storm sewer were too expensive, and decided to use the only other engineering practice to take care of surface water at a street intersection, and therefore constructed valley gutters across the street approximately seven inches deep, and that plaintiff was thrown from the car in which she was riding when the car was driven over the valley gutters. Plaintiff did not allege that the valley gutters were negligently constructed or that they were not kept in repair, but based her action on the inherent danger of such construction. *Held:* Defendant municipality may not be held liable in damages, since the adoption by it of the plan of construction complained of was in the exercise of a governmental function.

3. **Same—**

   Where a city constructs valley gutters across a street to take care of surface water, its later replacement of the original asphalt with cement and a lessening of the depth of the gutters will not be held a departure from the original plan of construction.

**4. Automobiles § 12a—**

> The statutes prescribe certain maximum limits of speed, but a motorist must at all times operate a vehicle with due regard to the width, traffic, and condition of the highway.

CONNOR, J., dissents.

CLARKSON, J., dissenting.

APPEAL by plaintiff from *Pless, Jr., J.,* at third March Term, 1937, of WAKE. Affirmed.

This is an action instituted by the plaintiff for the recovery of damages for personal injuries sustained by her as a result of being thrown from the seat of an automobile in which she was riding as a guest along North Person Street in the city of Raleigh. At the intersection of North Person Street and East Jones Street plaintiff was thrown from the rear seat of an automobile when it struck a valley gutter constructed at said intersection. As a result thereof she sustained serious injury.

When North Person Street was paved said valley gutter was constructed across said street at the intersection of Jones to provide for surface water. Later, by reason of the heavy traffic, the asphalt surfacing was removed and replaced with concrete. At that time the depth of the valley was decreased so that there was at the time of the accident a dip of six or seven inches in the valley.

After the jury had returned a verdict in favor of the plaintiff the trial judge set the same aside as a matter of law on authority of *Blackwelder v. Concord,* 205 N. C., 792, and rendered judgment in favor of the defendant. The plaintiff excepted and appealed.

*J. M. Broughton, Wm. H. Yarborough, Jr., and Jones & Brassfield for plaintiff, appellant.*

*Clem B. Holding for defendant, appellee.*

BARNHILL, J. There is no allegation that the valley gutter constructed on North Person Street at the point where said street intersects Jones was negligently constructed or that it was in a state of bad repair. The substance of the plaintiff's allegation of negligence is to the effect that the existence of a valley gutter of this type upon a public street makes the street dangerous for traffic and creates hazards to the public, and that it is negligence on the part of the city and a failure to exercise reasonable care to permit such condition to exist and continue.

While the construction and maintenance of public roads and streets is a governmental function the courts have almost universally permitted recovery against a city or town where injury results from negligence in the construction of a street or from negligent failure to maintain the

street in a reasonably safe condition. Where, however, the condition complained of is one which forms a part of the plan of construction of the street, determined upon and adopted by the city or town, it is held by this and other courts that no recovery may be had. The distinction is this: The adoption of plans for the construction of streets requires the exercise of *quasi*-judicial and discretionary powers; whereas the actual construction and maintenance of the street is ministerial.

A municipality, in determining the character or plan of construction of streets, sidewalks and other public ways, acts in a legislative, *quasi*-judicial and discretionary capacity. Therefore, it is not ordinarily liable for injuries resulting from danger or defects inherent in the plan of construction adopted or due solely to a mistake of judgment in adopting the plan. The rule is not limited to cases where the plan adopted was determined in advance, but applies equally where it was ratified and adopted by the municipality after the actual work of construction. 43 C. J., 1015; L. R. A., 1918-D, 1103; 37 L. R. A., N. S., 1150; 43 A. R., 655.

In *Blackwelder v. Concord,* 205 N. C., 792, *Brogden, J.,* quotes from *Martin v. Greensboro,* 193 N. C., 573, with approval, as follows: "But in view of the allegations in the complaint, we must furthermore assume that the sidewalks were built and the railway track was laid in pursuance of a plan approved and adopted by the authorities of the city. We are not at liberty to conclude that they acted without deliberation or without due regard to the safety of the public. If they erred, at least the reasonable inference is that their error was one of judgment. It is generally held that a municipal corporation is not liable for injuries to person or property resulting from its adoption of an improper plan when the defects in such plan are due to mere error of this kind. It must follow that the exercise of judgment and discretion in the adoption by the city of a general plan for the improvement of its streets, the building of its sidewalks, and the selection or approval of the space to be occupied by the track of the street railway is not subject to revision by a court or jury in a private action for damages based on the theory that the plan was not wisely or judiciously chosen; although a private action may be maintained for defective construction of the work or failure to keep it in repair. Herein is the distinction between injuries resulting from the plan of a public improvement made in a city or town and those resulting from the mode of its execution. The adoption of the general plan involves the exercise of judgment; the duty of constructing and maintaining the work done in pursuance of the plan is ministerial. The exercise of discretionary or legislative power is a governmental function, and for injury resulting from the negligent exercise of such power a municipality is exempt from liability." 90 A. L. R., 1495.

McQuillan on Municipal Corporations, 2nd ed., sec. 2799, states the rule as follows:

"As a branch of the rule of nonliability of municipalities for *torts* in connection with the exercise of governmental functions, is the rule which distinguishes (1) ministerial duties from (2) legislative, judicial, and discretionary functions. Where the duty is not governmental, but ministerial and absolute, as distinguished from legislative, discretionary, judicial or *quasi*-judicial, the municipal corporation is liable for damages arising because of omission to perform it, or for negligence in its execution. · . .

"However, the line between ministerial and legislative or judicial duties is sometimes difficult to draw. The distinction would seem necessarily to rest upon a discretion had by the city to discharge or not to discharge the duty because, where the duty is absolute and imperative and the city has no discretion, the duty is ministerial, its discharge not depending on the exercise of judgment, but being required by law. It is by force of this reason for the distinction between ministerial and judicial duties that a duty which is judicial before the municipality has entered upon the performance of it, frequently becomes, when its performance is entered upon, ministerial. The municipality has a discretion to do or not to do the work; the duty is, therefore, judicial up to the time that it is determined to do the work; but when the work is ordered the law often requires that it be done in a particular manner, or that it be not done in a certain way, and, therefore, after the work is ordered, the duty of the municipality to do the work in the manner required and not to do it in the way forbidden, is ministerial. The municipality as to these two things has no discretion; as to them its judgment is superseded, controlled and directed by the requirements of the law, and its duty is to comply with these requirements. . . .

"Official action is judicial where it is the result of judgment or discretion. It is ministerial when it is absolute, certain and imperative, involving merely the·execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion . . . (not so in this case).

"When the municipal council acts in its legislative capacity for governmental purposes the municipality is no more liable than the State would be for similar action taken by the Legislature. Likewise, a municipality is not liable for a failure to exercise powers entrusted to the judgment and discretion of its proper authorities, or for errors committed in their· exercise. *Dargan v. Mobile,* 31 Ala., 469, 133 Am. Dec., 505; *Judd v. Hartford,* 72 Conn., 350, 44 Atl., 510; *Vaughtman v. Waterloo,* 14 Ind. App., 649, 43 N. E., 476; *Stackhouse v. Lafayette,*

26 Ind., 17, 89 Am. Dec., 450; *Brinkmeyer v. Evansville,* 29 Ind., 187; *Kelley v. Portland,* 100 Me., 260, 61 Atl., 180; *Claussen v. Luverne,* 103 Minn., 491, 115 N. W., 643, 15 L. R. A. (N. S.), 698; *Carroll v. St. Louis,* 4 Mo. App., 191; *Rosenbaum v. New Bern,* 118 N. C., 83, 24 S. E., 1, 32 L. R. A., 123; *Hill v. Charlotte,* 72 N. C., 55, 21 Am. Rep., 451; *Richmond v. Virginia Bonded W. H. Corp.* (Va.), 138 S. E., 503, 506, citing the text."

When North Person Street and other streets in that vicinity were paved it was a proper governmental function of the city of Raleigh to make provision to take care of the surface water. The commissioners determined that catch basins and a storm sewer were too expensive and decided to use the only other engineering practice for such purpose, which was the use of valley gutters.

When the street was constructed the top surfacing of the valley gutters, as well as of the street, was of asphalt composition. A change of the surfacing to concrete so as to better care for the increasing traffic upon this street was not a departure from the original plan, such as would impose liability upon the city.

It might be well to note that while the statute prescribing rules and regulations for the operation of motor vehicles provides for certain maximum limits of speed, the controlling rule is that a motorist must at all times operate his motor vehicle with due regard to the width, traffic and condition of the highway. It is to be doubted that there is any danger existing to traffic by reason of the construction of these valley gutters so long as motorists operate their vehicles across the same with due regard to the condition existing. It is difficult to make any road or street free of hazard. The court below correctly held that this action is controlled by the principles enunciated in *Blackwelder v. Concord, supra.* The judgment below is

Affirmed.

CONNOR, J., dissents.

CLARKSON, J., dissenting: The majority opinion holds that the judge in the court below should have peremptorily instructed the jury in favor of the city of Raleigh on the issue of negligence. From this view I dissent.

Ordinarily negligence is one of mixed law and fact (*Filer v. N. Y. Central R. R.,* 49 N. Y., 47), but the question of negligence is primarily factual. *Lane v. Town,* 142 N. Y., 510, 37 N. E., 473; 1 Shearman & Redfield, the Law of Negligence, 6th ed., sec. 52. "It is well settled that where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law but of fact, and to be settled by a jury; and this whether the uncertainty arises from a con-

flict in the testimony, or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them." *R. & D. R. v. Powers,* 149 U. S., 43, 37 L. Ed., 642. "It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court." *Grand Trunk Ry. v. Ives,* 144 U. S., 408, 36 L. Ed., 485. If more than one inference can be drawn from the facts, the one of those inferences would permit the plaintiff to recover, the plaintiff has a right to have the jury pass on the facts. Even though the judge himself may not be convinced that such an inference is the sound and correct one, he must transfer this decision to the jury, the recognized fact-finding body. 1 Shearman & Redfield, *ibid.,* sec. 54. "Courts should not speak too confidently in determining as a matter of law what facts may be ignored by prudent people whose duty it is to be reasonably careful for the personal safety of others." *Queeney v. Willi,* 225 N. Y., 374, 122 N. E., 198.

The majority opinion recognizes that a city is liable for negligence in the care and maintenance of its streets, but that this rule is subject to an exception: Where the defect is one which was a part of the original, general plan of the city in constructing the streets, the city is not liable for injuries caused thereby. The majority rests the decision in this case upon this exception as stated in *Blackwelder v. Concord,* 205 N. C., 792. The exception, as there stated, dealt with a "fault . . . of the original plan of construction and drainage," and the decision was that the injury resulted "from the plan adopted in the exercise of the judgment of the governing authorities *and not from negligence in the execution of the plan in the construction and maintenance of the streets.*" (Italics mine.) *Ibid.,* p. 795. If there was no general plan in the present case, or if after the adoption of such a plan it was executed negligently or the construction and maintenance was executed negligently, the rule of the *Blackwelder case* is itself authority to support a recovery by the plaintiff.

Whether the defect in the street involved in this case was a part of the original plan of construction or grew out of the later construction and maintenance of this street is the determinative question. On this score the majority view is that there was no evidence of a departure from the original, general plan. Here I differ. There was some evidence that there was no general plan at all, and there was considerable testimony to the effect that changes had been made in the state of the street at this point. The following, which in my opinion should have gone to the jury, indicates the tenor of this evidence:

The construction engineer, who was with the city when the street was originally paved in 1915, testified: "There was no general plan adopted by the city of Raleigh prior to the pavement on Person Street. Arrange-

ments were made for the paving of that street by petition of the property owners. . . . In the construction of the street I took into consideration the drainage of that particular area and I recommended a sewer—a storm sewer with catch basins. . . . It was determined by the city not to put in the storm sewer; only financial reasons given for it. After the city determined not to put in the storm sewer at that intersection the only other engineering practice we could do was to put in valley gutters. That was some long time before United States Highway No. 1 came to Raleigh. (This street is now a part of U. S. Highway No. 1, with its heavy through traffic, and the car in which plaintiff was riding was that of a nonresident traveling from New York to Florida.) Back in 1913 and 1915 there were very few automobiles in Raleigh then at all; the traffic at that time consisted mostly of horse-drawn vehicles. . . . In 1915 these valley drains were put in with . . . approximately ten inches fall in the valley, from the top of the crown of the street to the invert of the valley gutter. . . . These two valley gutters were a distance of 42 feet from invert to invert. . . . I would say those valleys remained there in the street eighteen months to two years the first time, and *were then partially filled in with a mixture of asphalt.* . . . I don't guess we raised the valley gutters at that time over two or three inches. . . . *Traffic conditions commenced to get more and more on the street and we got complaints about the dips there and we were trying to eliminate them as far as possible* . . . *We were working on those valleys, building them up, several times between 1913, 1915, and 1917.* . . *During Mr. Page's administration Mr. Lassiter's force went out to that intersection and cut out the asphalt entirely down to the concrete base and replaced it with a concrete gutter; they raised the fall three or four inches, leaving anywhere from a six- to a seven-inch dip in there. That six- or seven-inch dip on each side remained as it was until February of last year* (the time of the accident). . . . *The purpose in going there and rebuilding that intersection was to eliminate that dip as much as possible, to ease it up.* . . . It eased up the accidents at that intersection; it was not a cure for them entirely; *there was still a severe traffic hazard at that intersection.* That hazard existed there up until this lady was injured last February. . . . I think the installation of catch basins placed on the west side at each corner and carried under the intersection through pipes is the only and best way to eliminate the traffic hazard at that intersection. . . . The engineering profession, as traffic has grown, put in a storm sewer and catch basin every time they can. Sometimes money keeps them from doing it. The old valleys are regarded as an antiquated method of construction."

The police officer in charge of the traffic department who served with the Raleigh police from 1924 to 1933 testified to the numerous accidents

at this point, concluding "That was considered one of the worst places in the city. . . . In approaching the dip you do not see it until you are on it."

There was a considerable body of similar evidence supporting this evidence of the engineer and police officer. In my opinion this evidence was ample to support the finding that the Raleigh officials, recognizing the defect in the original construction in the face of the increasing traffic load, undertook again and again to alter and modify that plan so as to reduce the hazard. It appears clear that such efforts, extending over a period of twenty years, were clearly *ministerial* in nature and not *governmental,* and that these were decisions of *administrative officers* in the discharge of *mandatory* general duties of maintenance and not the solemn acts of the *governing body* in the discharge of a *quasi-judicial* discretion in laying out a general plan of street construction. So long as they relied upon the original plan of construction they *might* have been protected, although there is authority to the contrary. *District of Columbia v. Caton,* 48 App. D. C., 96; *Perotti v. Bennett,* 94 Conn., 533, 109 Atl., 890; *Lebanon v. Graves,* 178 Ky., 749, 199 S. W., 1064; *Malloy v. Walker, Twp.,* 77 Mich., 448, 43 N. W., 1012.

Even where the rule permitting reliance upon the protection of the original plan is followed, if a city materially alters the original condition of a highway in the discharge of its duty to maintain it and in doing so leaves it in a condition dangerous to the general public, it should be held liable for an injury caused by its negligence. Particularly where a municipality has for twenty years had notice of the danger of a defect in original construction and has on numerous occasions altered the original condition of the street but without remedying the defect, I think it should be left to the jury to determine whether the city has departed from the original plan and, if so, whether the city in the discharge of the administrative duty of maintenance has been negligent.

A dangerous defect in a street is not by reason of its age any less dangerous to persons passing over it for the first time. A municipality does not by prescription attain the right to be negligent. Rather to the contrary, the older the defective condition the greater the certainty that the officials have notice of it. Municipalities should not be encouraged to maintain conditions which they know to be dangerous. The click of singletree and the jangle of trace chains have given way to the purr of engines and the scream of brakes. Highway conditions which were safe enough for travel in a more leisurely era may become a menace in the hurried life of today. Time marches on, and so must the law. Old rules, born of another day, must constantly be scrutinized in the light of a changing world. The ever restless troops of time in-

cessantly storm the old citadels. The oasis where we pause for the night is not the end of the pilgrimage; the Holy City which we seek always lies ahead. The unquestioning acceptance of the rules of the past is not an unmixed blessing. A formal logic which reasons from precedent alone sometimes insulates the mind against the overwhelming logic of reality. I am unwilling to extend further the logic of the rule which frees municipalities from liability for an injury due to a defect which was a part of the original, general plan of street construction. That rule savors too strongly of the attitude of the tyrant kings of the Middle Ages who justified the most vicious wrongs by the simple formula, "The king can do no wrong." In *Jack v. Greece,* 135 Misc., 479, 238 N. Y. Supp., 294, it was said: "The courts will not substitute their judgment for that of towns in planning a public improvement, but when the improvement has been made they will hold towns to their obligation to keep the improvement, if a highway, in a reasonably safe condition, and thus impose liability even though the condition was of original construction." In *Kiernan v. New York,* 43 N. Y. S., 538, 14 App. Div., 156, there is a statement of what I conceive to be the better rule: "It cannot be held, as a general proposition, that a city may excuse itself from a charge of negligence as to the condition and care of its streets merely by claiming that it acted judicially in determining to leave the street in a dangerous condition for public travel. The cases in which any such rule can be applied at all must necessarily be quite limited." It is because the view of the majority involves an extension of the rule and not a strict limitation upon its application that I dissent.

Retrospect: The plaintiff was a guest in a Buick sedan (1933 model) driven by her husband, on the way from New York to Florida. The plaintiff, her husband, and two friends were in the car. They had stopped overnight at a tourist home in Raleigh. At about 7:30 o'clock the next morning they started on to Florida. Plaintiff was sitting in the back seat with a lady friend. Her husband was driving about 18 or 20 miles an hour along Person Street, going south on U. S. Highway No. 1, and at the intersection of Person and Jones streets, plaintiff testified: "The car went down in a ditch and I was thrown up to the top of the car. It went down and I was thrown up again to the top of the car. I did not know what was going on. I just couldn't pick myself up. I fainted. That ditch was on one side of the street, on Person Street, at the intersection of Jones. I went into the first ditch and before I knew what happened we went into another ditch. . . . I was put into a cast from my knees up to my chin. . . . I had no use of my hands or arms. I couldn't sleep during that period and they had to give me injections—about four or five a day—to kill the pain for a short time, but it always came back. I cried all the time, it hurt me all

over. I suffered terribly." She described her terrible suffering. The doctor in New York, who later attended her, testified in part: "The fracture is of a permanent nature bearing in mind that there is a deformity which cannot be bettered in any way. It is a fixed deformity causing undue tension of the muscle and tendon structures about the side of fracture."

The two ditches or gulleys were six or seven inches deep, and the car in crossing caused plaintiff, while riding in the rear seat, to be thrown to the top of the car. The testimony of the city engineer shows no city planning by the governing body of the city at this intersection—at least this was a question for the jury, if the planning would determine this controversy. It was in evidence that on numerous occasions accidents occurred and cars and persons were injured at the intersection where these dips and gulleys were, and the accidents reported to the city of Raleigh. The jury awarded plaintiff a small verdict—$1,500.

We are now spending hundreds of thousands of dollars inviting strangers to North Carolina. We should at least assure these strangers of a safe haven within our borders. The jury of twelve men, under the law of "Good moral character and sufficient intelligence," gave damages. I think their verdict should be sustained. To the traveling public let us wave the usual signal, "Thank you; come again."