**Hazel Josephine CREASY, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. 84–0001–C.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 16, 1986.

W. Clyde Gouldman, II, Charlottesville, Va., for plaintiff.

E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

After plaintiff suffered injuries in a fall when the rotten subflooring of her kitchen gave way, she brought this suit against the Farmers Home Administration [hereinafter FmHA] under the Federal Tort Claims Act. Plaintiff contends that FmHA voluntarily assumed the duty of inspecting and repairing the floor and that its failure to do so renders the agency liable in tort under the Good Samaritan doctrine. FmHA denies that it undertook any duty to inspect or repair the floor and further argues that the plaintiff was contributorily negligent in continuing to use the floor and allowing the problem to grow.

The questions presented to this court are:

I. Did the FmHA owe plaintiff a duty to inspect and repair plaintiff's kitchen floor?

II. Was the agency's failure to inspect or repair the floor a proximate cause of plaintiff's injury?

III. Was plaintiff contributorily negligent?

## I. *Background*

The plaintiff and her husband purchased a home from FmHA on or about July 11, 1979. Shortly after moving into the house, the Creasys discovered that the bathroom shower leaked, causing flooding in the kitchen. Plaintiff promptly informed FmHA of the problem, and after several more phone calls by plaintiff, the agency had the shower repaired in February or March of 1980. A few weeks later, the plaintiff noticed a stained spot on the kitchen linoleum. As before, plaintiff notified FmHA and continued to call the agency in the ensuing months as the problem worsened. On February 4, 1981, the Creasys and their counsel met with representatives of FmHA to discuss arrearages in their loan payments. The problem with the kitchen floor was also discussed at that time. From that date until January, 1982, FmHA took no action to inspect or repair the floor, and plaintiff continued to call the agency intermittently about the problem. On January 21, 1982, the plaintiff was injured when she stepped down from the chair on which she had stood to change a light bulb and the floor gave way beneath her. Subsequent investigation by the housing inspector revealed that the damage to the floor had not been caused by the shower leak, but by a leaking water pipe which had been pierced by a nail when the house was constructed. As a result of the fall, Mrs. Creasy suffered a disabling disk injury.

## II. *Findings of Fact and Conclusions of Law*

### A. *Applicability of the Good Samaritan Doctrine*

■ Under the Federal Tort Claims Act, the United States is subject to liability in tort "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, provided that a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Accordingly, the federal government may be held liable under the "Good Samaritan" doctrine, which imposes liability for negligent performance of a voluntary undertaking, in jurisdictions where the doctrine applies to private parties. The United States Supreme Court specifically upheld the application of the Good Samaritan doctrine under the Tort Claims Act in *Block v. Neal*, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983), a case involving the FmHA. In *Block*, the buyer of a prefabricated house filed suit against FmHA, alleging negligent supervision of construction and negligent inspection of the house. The district court dismissed the complaint, but the Court of Appeals for the Sixth Circuit reversed, holding that the complaint stated a claim for relief based on the Good Samaritan doctrine:

> [O]ne who undertakes to act, even though gratuitously, is required to act carefully and with the exercise of due care and will be liable for injuries proximately caused by failure to use such care.

*Neal v. Bergland*, 646 F.2d 1178, 1181–82 (1981). The Supreme Court affirmed the Sixth Circuit's holding that the misrepresentation exception at 28 U.S.C. § 2680(h) does not bar a tort claim against the United States based on the Good Samaritan doctrine. Under § 1346(d), however, such claims may be brought only in jurisdictions which would apply the Good Samaritan doctrine to private persons as well. *See* 460 U.S. at 294, note 3, 103 S.Ct. at 1092, note 3.

Virginia case law concerning the common law Good Samaritan doctrine is sparse. The most direct statement on the doctrine was made by the Virginia Supreme Court

in *City of Richmond v. Virginia Bonded Warehouse,* 148 Va. 60, 138 S.E. 503 (1927). In holding the City liable for failing to shut off a water line after volunteering to do so, the Court stated, "Even a volunteer or a stranger is liable for an injury negligently inflicted on the person or property of another." 148 Va. at 73, 138 S.E. at 507.

The early cases concerning the duty owed to passengers by the driver of an automobile shed some additional light. Those cases uniformly held that a driver was liable for injuries caused by gross negligence. E.G., *Boggs v. Plybon,* 157 Va. 30, 160 S.E. 77 (1931). The gross negligence standard articulated by *Boggs* was, of course, superseded by the guest statute, Virginia Code § 8.01–63, but the courts' willingness to impose liability on "one who undertakes to perform a duty gratuitously" strengthens the conclusion that the common law Good Samaritan doctrine has been accepted in Virginia. 157 Va. at 38, 160 S.E. at 80.

More significantly, the enactment of Virginia Code § 8.01–225, which exempts from civil liability any person who renders emergency care or assistance in good faith without compensation, indicates that volunteers are normally liable for negligence in Virginia. In short, the Good Samaritan statute, which shields one who renders gratuitous emergency medical care, presupposes the existence of the Good Samaritan doctrine, which subjects one who undertakes any duty gratuitously to liability for negligence.

Based on the above analysis, the court concludes that the common law Good Samaritan doctrine has been accepted in Virginia and therefore applies to the federal government under the Federal Tort Claims Act. When an agency of the United States voluntarily undertakes a task, it accepts the duty of performing that task with due care. *Rogers v. United States,* 397 F.2d 12, 14 (4th Cir.1968).

### B. *Duty by FmHA*

■ In applying the Good Samaritan doctrine, the court must determine whether the FmHA took upon itself the duty to inspect and repair the floor of plaintiff's house. Both Mr. and Mrs. Creasy testified at trial that prior to closing on the house, they were told on several occasions by Mr. Dunn of FmHA that they were not to make major repairs on the house themselves, but instead to call the agency if major repairs were needed. In addition, both the agreement and the deed of trust signed by the parties indicate that the agency retained supervisory authority over major repairs. Among the duties of the purchaser listed in the deed of trust is, "To maintain improvements in good repair and make repairs required by the government." The agreement provides, "All security property will be properly maintained under FmHA supervision." Mrs. Creasy testified that Mr. Dunn explained to her that FmHA did not want to be saddled with improper repairs if the property reverted to the agency, and it was for this reason that she was to call FmHA when a major repair was needed. These statements were confirmed by the agency's response to the plaintiff's report in early August of 1979 of the problem with the shower. Representatives of FmHA repeatedly assured the plaintiff that the agency would look into the problem, and some seven or eight months after it was first told of the leak, the agency did in fact fix the shower. The significance of the shower incident is simply that the agency's response to the problem gives weight to the Creasys' testimony that they were told not to make major repairs without the agency's involvement and strengthens their argument that FmHA undertook a general duty to inspect problems requiring major repairs and either authorize or make the repairs.

FmHA responded to the plaintiff's report of the problem of the kitchen floor in the same way as it had responded to her complaint about the leaky shower, giving her repeated assurances over a long period of time that the agency would investigate the problem. Although the agency later sought to deny the extent of its communications concerning the kitchen floor, the

evidence clearly shows that the plaintiff made several phone calls between April of 1980 and the time of the accident and that in these calls Mr. Dunn and other FmHA representatives assured her that the agency would investigate the problem with the kitchen floor. Furthermore, the clear weight of the evidence is that the agency gave additional assurances about inspection and possible repair of the kitchen floor at the hearing on February 4, 1981.

Based on all of the evidence presented in the case, the court finds that FmHA undertook the duty to inspect the Creasys' kitchen floor and then either repair the problem or supervise repairs by the Creasys. By voluntarily assuming this duty, the agency took upon itself the legal duty to exercise due care and may be held liable in tort for its failure to do so.

### C. Proximate Cause

Having established that FmHA had a duty to inspect the floor and initiate or supervise repairs, the court must determine whether the agency's failure to perform its duty was a proximate cause of the plaintiff's injury. At trial, Barry N. Parrish, the Fluvanna County Building Inspector, testified that the subflooring in the kitchen and utility alcove had rotted due to water damage from a leaking pipe. Mr. Parrish's inspection indicated that the pipe had been pierced by a nail during the construction of the house, and that the leak had developed over time as the nail deteriorated. Following his inspection, Mr. Parrish notified Nationwide Homes, the builder of the house. Nationwide subsequently replaced an approximately 11 × 12 foot section of the subflooring. From Mr. Parrish's testimony and other evidence submitted at trial, it is clear that FmHA would have discovered the severely rotted subflooring and the source of the leak if the agency had inspected the Creasys' kitchen floor as it had promised. Having discovered the condition of the floor, the agency would surely have replaced the damaged subflooring or required the Creasys to do so under its supervision. In either case, Mrs. Creasy's injury would have been avoided. It is clear that the agency's inaction allowed the problem to grow to the point that the floor was unsound. FmHA's inaction was therefore a proximate cause of Mrs. Creasy's injury.

### D. Contributory Negligence

FmHA contends that the plaintiff was contributorily negligent in continuing to use the floor despite the progressive discoloration and softening of the linoleum over a long period of time. This contention is not supported by the evidence. Testimony at trial established that despite the changes in the linoleum, the floor did not seem weak. Indeed, Mr. Parrish, the building inspector, testified that even after the accident, he had no real concern about walking on the floor. Plaintiff's use of the floor was therefore reasonable.

FmHA further argues that the passage of time in effect relieved the agency of its duty and that the Creasys were negligent in not taking action themselves after a period of time. The court disagrees. Having told the Creasys not to undertake major repairs on their own and then repeatedly promising to inspect the kitchen floor, FmHA can hardly use its own delinquency as a basis for a contributory negligence defense. Mrs. Creasy properly followed the procedure that FmHA had explained to her. She promptly notified FmHA when she first discovered the problem with the floor, and continued to call the agency as the problem worsened over time. The delay in rectifying the problem was solely the fault of FmHA, and is evidence of negligence by the agency, not by the plaintiff.

Moreover, the evidence shows that FmHA's failure to inspect the floor was due in part to the agency's dismissal of Mrs. Creasy's complaints as frivolous. Joseph W. Newbill, District Director for FmHA, testified that persons facing foreclosure by FmHA routinely complain about the condition of their houses as an excuse for not making their payments. The testimony indicated that the agency disregarded such complaints, and indeed Jacqueline Nuckols of FmHA pencilled the notation,

"Not interested" on a letter about the floor problem. However, the agency never indicated to the Creasys that it did not intend to investigate their complaints. To the contrary, FmHA officials repeatedly assured the Creasys the agency would look into the problem. The Creasys' reliance on these assurances was reasonable, especially in light of the instructions they had been given when they bought the house and their experience with the agency's delay in repairing the shower.

Finding no contributory negligence, the court will award judgment to the plaintiff.

### E. *Damages*

Medical experts presented by both parties testified that Mrs. Creasy sustained a disk injury at the time of her fall. As a result of this injury, she suffers from disabling back pain and the accompanying restriction of movement as well as some weakness and loss of sensation in her left leg. She has undergone two unsuccessful laminectomies and unsuccessful nerve block treatment at the ·University of Virginia Pain Clinic. Mrs. Creasy must now rely on powerful painkilling medication to ameliorate the more severe bouts of pain. This medication impairs her ·mental faculties and reaction time.

■ In fixing damages, the Court first notes that the parties stipulated that the plaintiff's medical expenses from the time of the accident until the trial amounted to approximately $21,000.00. Expert witness Norman Edwards, a professor of economics at the University of Richmond, testified that plaintiff's lost wages from the time of the accident until the time of the trial amounted to $33,695.00 and that her other economic losses for that period totaled $15,081.00. There was no counter-testimony on these figures, and finding them reasonable, the Court fixes total past economic damages and medical expenses at $69,776.00.

■ On the issue of future losses, the Court was presented conflicting testimony concerning the extent of plaintiff's disability. Dr. Charles W. Miller, the orthopedic surgeon who had followed Mrs. Creasy's case since October, 1983, characterized her as completely disabled, adding that he could not conceive of anything she could do in the way of meaningful employment. Likewise, Dr. Randolph E. Lanford, Mrs. Creasy's family physician, stated that she was definitely unsuitable for any type of employment, although he described her condition as a 75–80% disability. In contrast, Dr. Paul Fitzgerald, an orthopedic surgeon presented by the defendant, testified that on the basis of his examination of the plaintiff and his review of the medical records, he considered her condition a 20–25% disability and that with intensive rehabilitation, it was possible that she could work again.

Dr. Fitzgerald conceded, however, that no more than 30% of double laminectomy patients can return to jobs involving heavy labor. Mrs. Creasy did in fact attempt to return to her job on the assembly line at the Uniroyal tire plant several times, but pain and difficulty in bending prevented her from doing the work. She then tried a more sedentary job, sitting with older people, but found that bouts of pain forced her to lie down too often to do the job. Although Mrs. Creasy expressed a sincere desire to work, she testified that vocational counselors had been unable to find work that she could do.

In addition to suffering disabling pain and the accompanying restriction of movement, Mrs. Creasy suffers side effects from the strong narcotic drug she must take occasionally to ameliorate the more severe bouts of pain. The medication impairs her mental faculties and makes her drowsy, further diminishing her ability to work. There is nothing in the record that indicates that this condition is likely to improve. To the contrary, Mrs. Creasy's physician, Dr. Lanford, testified that he did not foresee any improvement. Based on the evidence, the Court concludes that it is highly unlikely that the plaintiff will ever be able to work more than two or three hours a day. These limited hours, coupled with the unpredictability of the severe

bouts of pain, render the possibility of employment for Mrs. Creasy a remote one.

Professor Edwards calculated plaintiff's future economic losses based on the assumption that she would not work again. From the resulting figure of $190,390.00, the Court will deduct the sum of $47,-597.50, or twenty-five percentum (25%) to reflect the possibility that Mrs. Creasy will be able to find and keep part-time employment.

In addition to the medical expenses and economic losses, the court awards $50,-000.00 for pain and suffering. From the total award of $262,568.50, the court must deduct a settlement payment of $19,111 by Nationwide Homes, a joint tortfeasor under Virginia Code § 8.01–35.1. Judgment will therefore be entered for plaintiff in the amount of $243,457.50.

An appropriate Order shall this day issue.