**Nell D. AUTERY, as Administratrix of the Estate of Roy Franklin Autery, deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Charlotte SCHREINER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 90–0884–P–S.

United States District Court, S.D. Alabama, S.D.

March 12, 1992.

Joseph M. Brown, Jr., David G. Wirtes, Jr., Cunningham, Bounds, Yance, Crowder & Brown, Mobile, Ala., for plaintiff.

William R. Sawyer, Asst. U.S. Atty., Mobile, Ala., for defendant.

## OPINION AND ORDER

PITTMAN, Senior District Judge.

This matter was heard by the court sitting without a jury on January 30–31, 1992. The parties announced ready for trial, opening statements were made, evidence was presented, and closing arguments were made.

This case involves an accident that occurred in a national park and arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 [hereinafter "FTCA"]. Roy Franklin Autery was killed in the accident, and Charlotte Schreiner—a passenger in Mr. Autery's car at the time of the accident—was injured in the accident.

Following the accident, proper and timely administrative claims were filed on behalf of both Autery and Schreiner, as is required by 28 U.S.C. § 2675(a). Autery's administrative tort claim was for $500,-000.00, and Schreiner's was for $50,000.00. Plaintiffs' exhs. P, O. Both claims were denied. *Id.*

A claimant under the Federal Tort Claims Act is ordinarily restricted in the amount he or she may recover upon a finding of governmental liability to the amount specified in the administrative claim, "except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b).

On November 26, 1990, Mr. Autery's estate filed suit against the United States, claiming that negligence on the part of the United States caused Mr. Autery's death. Doc. 1. On that same day, Ms. Schreiner filed a separate suit against the United States, claiming that negligence on the part of the United States caused her injuries. Doc. 1A. The cases were consolidated on March 4, 1991. Docs. 12 & 12A.

On December 5, 1991, the plaintiffs filed second amended complaints, which added a claim that the death and injuries were caused by wantonness on the part of the United States. Docs. 37–38. These claims originally sought punitive damages, but plaintiffs' counsel later dropped the punitive damage claims. *See* Doc. 59 at 3 n. 1.

The basic facts concerning the accident in this case are not disputed. The accident occurred on July 5, 1989, in the Great Smoky Mountain National Park ["GSMNP"] on U.S. Highway 441, which is maintained and operated by the United States. Ray Franklin Autery was driving his 1989 Camaro south on U.S. Highway 441, also known as the Newfound Gap Road, in a part of GSMNP that is in the state of North Carolina. Ms. Schreiner was a passenger in the car, and the vacationing couple was approximately two hundred yards from the Oconaluftee Visitor's Center when a twin trunked black locust tree fell into the roadway. One trunk of the tree—the root of which was located approximately forty-five feet up the west bank of the road—struck Mr. Autery's car, instantly killing him and injuring Ms. Schreiner.

Plaintiffs contend that the United States was negligent in one or more of the following ways:

i. Negligently failing to properly maintain the National Park area where the accident occurred by failing to identify and remove the hazardous trees.

ii. Negligently failing to properly inspect the trees in the National Park along the area where this accident occurred....

iii. Negligently failing to warn visitors to the Great Smoky Mountains National Park of the potential dangers of falling trees along U.S. Highway 441.

iv. Negligently failing to devise, implement and follow an appropriate tree hazard management plan for the identification and removal of hazardous trees such as the one which fell in this case....

v. Negligently failing to train its employees as to the necessity for and the appropriate method of identifying tree hazards and removing hazardous trees.

vi. Negligently failing to provide sufficient manpower for the proper identification and removal of hazardous trees

pursuant to the mandate of NPS Special Directive 76–9....

vii. Negligently failing to identify and remove the hazardous trees which fell and struck Plaintiff's decedent....

Doc. 24 at 5–6. The plaintiffs also claim that the defendant's actions were wanton with regard to the failures alleged above. Ms. Schreiner claims that she suffered mental anguish because of the government's alleged negligent and/or wanton conduct.

On September 4, 1991, the defendant filed a motion for summary judgment on the grounds that Schreiner and Autery [hereinafter "plaintiffs"] were licensees as a matter of North Carolina law, and as such the United States was only under a duty not to willfully injure them or to wantonly or recklessly expose them to danger. Doc. 23 at 6–9. The United States claims that it did not breach this duty. *Id.* at 9–10.[1]

The plaintiffs assert that even if they were licensees, the United States voluntarily assumed a higher duty toward them by undertaking a tree hazard plan and by classifying park visitors as invitees rather than licensees. Doc. 42 at 7–8.

In its answer to the plaintiffs' second amended complaint (Doc. 45) and its supplemental memorandum in support of its motion for summary judgment (Doc. 49), the defendant raises as a defense the "discretionary function exception" to the Federal Tort Claims Act, 28 U.S.C. § 2680(a).

Pursuant to 28 U.S.C. § 636(b)(1)(B), the motion for summary judgment was referred to the Magistrate Judge, who on January 24, 1992, issued a report and recommendation. Doc. 59. The Magistrate Judge, in recommending that the motion for summary judgment be denied, found that "no reasonable range of choices existed with respect to the Park Services' inaction, and, as such, the discretionary function doctrine of 28 U.S.C. § 2680(a) is inapplicable." *Id.* at 12. The Magistrate Judge also found that, as a matter of

North Carolina law, plaintiffs were licensees and not invitees. *Id.* at 14. The United States filed objections to the Magistrate Judge's Report and Recommendation on January 28, 1992. Doc. 60.

On the day of the trial, before testimony was taken and after due and proper consideration of all portions of this file deemed relevant to motion for summary judgment, including the objections of the United States and the arguments of counsel, the court advised counsel that the Report and Recommendation of the Magistrate Judge as to the status of the plaintiffs as licensees was adopted as the opinion of this court, as is more fully explained below.

After due consideration of the testimony and demeanor of the witnesses at trial and of the pleadings, exhibits, and arguments offered by both parties, this court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Agreed Facts

A. This accident occurred within the State of North Carolina along U.S. Highway 441 [also known as Newfound Gap Road] in the Great Smoky Mountains National Park which is owned and operated by the defendant, United States of America.

B. Roy Franklin Autery was killed instantly on July 5, 1989 at approximately 9:55 a.m. as he was driving south on the Newfound Gap Road approaching the Oconaluftee Visitor's Center when two (2) locust trees located at forty-five (45) feet up the west bank of the road fell into the roadway.

C. Charlotte Schreiner was a passenger in the vehicle driven by Mr. Autery and was injured as well in the accident.

D. Newfound Gap Road is a two-lane road traveling through a nearly straight segment where the accident occurred. The traffic was generally heavy for the time of

---

1. Alternatively, the United States claims that it did not breach its duty of care even if it owed a duty of reasonable care to the plaintiffs. Doc.

24 at 7. Furthermore, the United States contends that it is not liable except to the extent that sovereign immunity has been waived. *Id.*

day due to increased July 4th holiday visitation.

E. The accident occurred near a road sign which states: "35 Miles Per Hour, Congested Area."

F. At the time of the accident the sky was cloudy, but dry. There was no significant wind. The temperature was moderate.

G. Roy Franklin Autery was pronounced dead at the scene of the accident.

H. That the death certificate attached as Exhibit A to Plaintiffs' Request for Admissions filed April 4, 1991 is a true and correct copy of the death certificate issued by the appropriate authorities concerning the cause of death of Roy Franklin Autery.

I. That the list of general expenses attached as Exhibit B to the Request for Admissions filed April 4, 1991 is a true and correct copy of the expenses incurred by the Estate of Roy Franklin Autery in his burial.

J. That the list of medical expenses, with supporting documents, identified as Exhibit C in Plaintiffs' Request for Admissions of April 4, 1991 is a true and correct list of medical expenses which were reasonably and necessarily incurred by plaintiff, Charlotte Schreiner, concerning her injuries suffered in the accident made the basis of this suit.

K. That the medical records concerning the treatment received by Charlotte Schreiner by Dr. Provost at C.J. Harris Community Hospital, 59 Hospital Road, Sylva, North Carolina 28779, and attached as Exhibit D to Plaintiffs' Request for Admissions filed April 4, 1991 are true and correct copies of the medical records maintained at that institution concerning Ms. Schreiner's treatment.

L. That the medical records from the University of South Alabama Medical Center attached as Exhibit E to the Plaintiffs' Request for Admissions of April 4, 1991 are true and correct copies of medical records maintained by that institution concerning the care and treatment of Charlotte Schreiner as a result of the injuries made the basis of this suit.

M. That the divorce decree attached as Exhibit F to the Request for Admissions of April 4, 1991 is a true and correct copy of the divorce decree applicable to Roy Franklin Autery and his first wife, Janice Autery, setting forth the child support, alimony and other obligations of Roy Franklin Autery to Janice Autery and for the benefit of the children of the marriage, Ronald F. Autery and Amanda E. Autery.

N. That the letter of March 21, 1991 signed by G.S. Weeks, Human Resources Associates of UOP Molecular Sieve Plant, Post Office Box 11486, Chickasaw, Alabama 36611 and identified as Exhibit G to the Request for Admissions of April 4, 1991, constitutes a list of 1989 earnings of Roy F. Autery from January 1, 1989 through July 23, 1989.

O. That the individual income tax returns attached as Exhibit H to the Request for Admissions of April 4, 1991 are true and correct copies of the returns filed on behalf of Roy Franklin Autery for the years 1989, 1988, 1987, 1986 and 1985.

P. That, according to the income loss report for Mr. Roy F. Autery prepared by the plaintiffs' economic expert witness, A.M. Agapos, Ph.D., the total present value of lost income and fringe benefits, when using a 0% growth rate and a 2.0% after-tax discount was $572,239.65.

Q. That Roy Franklin Autery's date of birth was September 1, 1948 and his date of death was July 5, 1989.

R. That Roy F. Autery had a remaining expected work life as of the date of his accident of twenty-one (21) years.

S. That Roy F. Autery completed the twelfth grade but had no further formal education.

T. That Roy F. Autery had an annualized income at the time of his death of $35,356.00 and an after-tax income of $29,702.00.

U. That at the time of the accident made the basis of this suit the Great Smoky Mountain National Park did not have in force and effect a written tree hazard management plan.

V. The Great Smoky Mountain National Park is the most visited national park in the country with annual visitors of approximately 8.5 million people.

W. In February 1990 the supervisor of the Great Smoky Mountain National Park, Mr. Cole, signed and implemented the first written hazardous tree policy for the Great Smoky Mountain National Park.

### Undisputed Facts

1) The estate of Roy Franklin Autery incurred funeral expenses in the amount of $4574.75.

2) Charlotte Schreiner incurred medical and related travel expenses in the amount of $477.30.

3) Plaintiffs filed their administrative claims in a proper and timely manner.

### Further Findings by the Court

4) The tree in question was approximately fifty years old, approximately seventy feet in height, and fell due to root rot.

5) Although GSMNP did not have a written, formalized tree hazard management plan until June 1990, it was the established practice at the park for all employees to identify and report known or potentially hazardous trees to supervisors or maintenance personnel for appropriate action. Clarence Rice, an employee of the park since 1969 and Director of Safety and Concessions since 1975, testified at the trial that this had been the practice of the park for as long as he worked there. Also, in a memo dated July 30, 1990, Park Superintendent Randall Pope stated that:

> Although *no formalized,* documented hazard tree management policy was established before June 8, 1990, for the Great Smoky Mountain National Park, it *has been standard procedure for all employees to report known or potentially hazardous trees to area supervisory ranger or maintenance personnel for timely and appropriate action....* Along Newfound Gap Road (U.S. 441), patrol rangers or other employees traveling the road report dead or hazardous trees, hanging dead limbs, etc. to the roads foreman for appropriate action. Also, trees and limbs have been removed for sight distance along Newfound Gap Road. This has been an ongoing procedure for many years. Too much growth along the road, especially on curves, blocks the view of oncoming vehicles....
>
> *We established a procedure years ago,* though not documented policy, whereby all employees would make every reasonable effort within the constraints of budget, manpower, and equipment available *to recognize and report for removal hazard trees along roads,* in campgrounds, in picnic areas, along paved trails, and around structures (emphasis added).

6) GSMNP received the following mandate by National Park Service Special Directive 76–9 (Health and Safety of Park Visitors, *October 5, 1976*):

> Protection of the visitor, and park and concessioner employees, from violations of laws and regulations and from hazards inherent in the park environment, is a prime responsibility of the National Park Service. *The saving and safeguarding of human life takes precedence over all other park management activities,* whether the life is of the visitor, concessioner, or park employee.... (emphasis added).

After quoting this directive, the Tree Hazard Management Plan makes the following statement, which the court finds—in light of the July 30, 1990, memo from Randall Pope quoted supra—was the policy at GSMNP at the time of the accident made the basis of this suit:

> Therefore, the policy of the National Park Service at Great Smoky Mountain National Park will be that we will make every reasonable effort within the constraints of budget, manpower, and equipment available to detect, document, remove, and prevent tree hazards, as provided for by this Tree Hazard Management Plan.

7) At the time of the accident made the basis of this suit, and for at least seven months before the accident, the defendant knew of the peculiar risks attendant to

black locust trees in high-density areas. Defendant's expert, plant pathologist William H. Sites, testified that the following information, which was contained in a letter from Dr. Sites to Mr. Keith Langdon dated November 9, 1988, was "critical safety information":

> *Black locust trees* are short-lived and due to decay (following borer activity), break up and drop limbs and tops. Avoid them in new areas; *remove* them *when possible* in existing areas. (emphasis added).

There is also evidence that Mr. Tim Stubbs, the primary preparer of the written tree hazard management plan, received the following information from Dr. Sites in à letter dated November 26, 1986:

> *Black locust* is a short-lived tree and is very prone to limb failure because of the activities of the locust borer and the fungus *Fomes rimosus.*

8) The information contained in the Sites letter to Dr. Langdon was critical safety information. Defendant's expert Dr. Sites testified that it was "critical safety information." Mr. Tim Johnson, plaintiffs' tree safety expert, testified that it was "valuable, critical safety information."

9) Mr. Langdon is the Supervisory Natural Resource Specialist at GSMNP, and was instrumental in the formulation of the written tree hazard plan. He received the information noted above in conjunction with the written distillation of the plan and testified at trial that, *prior to the accident,* he had meetings with park rangers and maintenance personnel regarding the information contained in the letter from Dr. Sites. He also testified that he circulated the letter to Tim Stubbs (the primary plan preparer), to Dean Berg (Mr. Langdon's supervisor), and Joe Abrell (Mr. Langdon's division chief), and that he discussed the information with several maintenance people from both sides of the park. These maintenance persons had the necessary knowledge to make a close inspection and to identify the black locust tree hazard. These people included Louis Smith (the person responsible for tree maintenance on the North Carolina side of the park), Frank Hyatt (facility manager responsible for maintenance on the North Carolina side of the park), Robert Hockman (facility manager responsible for maintenance on the Tennessee side of the park), Don Stevenson (a maintenance foreman on the Tennessee side of the park), James Patty (a maintenance worker on the Tennessee side of the park), and Buford Price (park personnel).

Mr. Langdon and his superiors, who were charged with the duty to prepare a *written* tree hazard plan and who later prepared such a plan, had or should have had the knowledge that upon the receipt of Dr. Sites' warning of the black locust tree danger, were negligent in not taking more positive, aggressive action to eliminate the hazard in areas such as the place where the accident occurred.

There is no evidence that any actions were taken with regard to reducing the hazards identified with the black locust trees.

Regarding the constraints of personpower and budget, there is no indication in the evidence that the defendant took any action the reasonableness of which would be effected by these considerations. If the maintenance people responsible for identifying and removing tree hazards had acted on the information they had received prior to the accident, the black locust tree here in question could have been removed. If Mr. Langdon and his superiors had acted more promptly and aggressively, the tree involved in the accident could have been removed. The tree was in a congested, urban, or high density area. It was positioned on a downward slope toward the road and was of sufficient height that from the road it easily could have been ascertained that it would fall across the road if it happened to fall. Had the knowledge that several of the maintenance personnel received from discussion with Mr. Langdon been acted upon, they had sufficient information to make a close inspection of the tree, which would have revealed its diseased condition, and to remove it. The failure of the defendant to identify and remove the tree that killed Mr. Autery and injured Ms. Schreiner was a failure by the

defendant to use due care in the safeguarding of human life by the removal of black locust tree hazards.

The maintenance personnel were divided between the Tennessee side (or west side) of the mountain range and the North Carolina side (variously referred to as the east or south side) of the mountain range. There were 33 miles of paved road on the North Carolina side of the park, and the only a small portion of that was located in urban, congested, or high density areas. The testimony was that there were very few black locust trees, if any, near the immediate environs of the campgrounds, visitor centers, or the pedestrian walkways at or near these two particular areas. The testimony also revealed that there were relatively few black locust trees on downward slopes of such height that, had they fallen, would have struck motor vehicles or persons in any of these areas.

This court does not find budget and personpower constraints, persuasive in these circumstances.

10) The tree that struck Mr. Autery's car was variously described as one tree with two trunks and as two trees with a common root system. The difference is basically semantic. The court will refer to it as one tree with two trunks. The accident happened when one trunk of the tree "failed due to a loss of anchorage which resulted from infection by the root and butt rot fungus *Armillaria mellea.*" The upper part of the first trunk was also effected by *Fomes rimosus,* another decay fungus. When that trunk fell, it torqued down the other trunk through the common root. Plaintiffs' exh. N–10. The first trunk hit the car and caused Mr. Autery's death and Ms. Schreiner's injuries, while the second trunk, which also had heart rot, fell into the road. *Id.*

11) The black locust tree that caused Mr. Autery's death and Ms. Schreiner's injuries failed because of the specific hazard pointed out in the letter from Dr. Sites to Mr. Langdon and the letter from Dr. Sites to Mr. Stubbs. Dr. Sites testified to this at trial, and this testimony was not disputed.

12) The black locust tree that caused Mr. Autery's death and Ms. Schreiner's injuries had visible, external symptoms of the decay that caused it to fall. The external decay was on the side of the tree that was not visible from the highway. Plaintiffs' expert Johnson testified that the portions of the tree he examined after the accident had a large exterior portion of decay. Mr. Louis Smith, an engineering equipment operator foreman at GSMNP, observed the tree in the position in which it fell on the day of the accident and testified that almost half of the bark appeared to have been missing from the tree when it fell. Defendant's tree expert Dr. Sites testified that the decay he observed in the tree after it fell would have evidenced itself on the tree's exterior.

13) The black locust tree that caused Mr. Autery's death and Ms. Schreiner's injuries was located approximately 200 yards from the Oconaluftee Visitor's Center. The tree hazard management plan adopted in 1990, which evidenced GSMNP's *prior policy* and practice, stated that "[t]he areas of the park in which the NPS will inspect and remove tree hazards are any 'urbanized' areas of sustained visitor or employee use."

At the trial plaintiffs' expert, Mr. Tim Johnson, described the area at which the tree fell as a "priority 1 urbanized area." Clarence Rice, Director of Safety and Concessions at GSMNP, described the area as a "high impact area." Defendant's expert Dr. Sites testified that he would consider the area a higher priority area than all other areas except visitor centers, campgrounds, and pedestrian walkways adjacent to visitor centers and campgrounds. The defendant stipulated that the portion of the road where the accident happened was designated a "congested area" by a road sign.

It is clear from the evidence that, because of the proximity of the accident to the Oconaluftee Visitor Center, the accident happened in a location prone to heavy, sustained use by visitors to the park. The accident occurred on the North Carolina side of the mountain range, which is referred to as the east or south side of the

park. Oconaluftee Visitor Center is one of three visitor centers in the park. The brochure for GSMNP suggests that visitors entering from the North Carolina (or east or south) side of the park should make the Oconaluftee Visitor Center their first stop in the park. The GSMNP is the most visited park in the United States with annual visitors of approximately 8.5 million people. Assuming that between 2.125 to 4.25 million of these people (¼ to ½ of the 8.5 million annual visitors) travel past Oconaluftee Visitor Center within a year, the daily average of people passing the scene of this accident would be between 5,822 and 11,644. These averages do not reflect the seasonal variations of visitor traffic and actually would be higher because of the fact that the accident occurred in a high impact, congested, or urbanized area, nor do the averages reflect that GSMNP visitor traffic is heaviest during the summer months and that the accident occurred during a national holiday season, July 5.

The court finds that the scene of the accident here at question was located in an high impact, congested, or urbanized area that the defendant knew or should have known was subject to heavy, sustained use by visitors to the park.

14) The inspection of trees for tree hazards at GSMNP was and is conducted initially from trucks driven along the road by rangers and maintenance personnel, although all park employees were and are supposed to report any potentially hazardous trees of which they become aware. Once a tree that appears to be hazardous is reported, the tree is inspected closer by the maintenance personnel and appropriate action is taken.

15) The failure of the defendant to implement, after becoming aware prior to the accident of the hazards black locust trees presented, a closer inspection of tree hazards with regard to high impact areas such as the scene of the accident was a failure to use due care on the part of the defendant in the course of safeguarding human life by identifying and removing tree hazards.

The court is not impressed by defendant's arguments to the effect that GSMNP is so large that any more rigorous scheme of inspection would be impossible, or at least unreasonable. The evidence reflects that there are 33 miles of paved road on the North Carolina side of the park. Of this 33 miles, only a small portion would be at or near the high impact, congested, or urbanized areas of the park on the North Carolina side.

16) There is insufficient evidence to sustain the wanton count. There is no evidence that the defendant's failure to utilize the information with regard to black locust trees would constitute wantonness under North Carolina law.

17) In their administrative claims, Mr. Autery's estate sought $500,000.00 and Ms. Schreiner sought $50,000.00. The plaintiffs contend that they should be allowed to seek more than these amounts in this action because later discovery showed evidence of wantonness that was not discoverable at the time of the administrative claim. Mr. Autery's estate also contends that they should be able to seek more because their actuarial expert showed that Mr. Autery's future earnings exceed $500,000.00. However, there is no evidence that the amount of Mr. Autery's future earnings was not reasonably discoverable before the administrative claim was made. The court finds that the amount of Mr. Autery's future earnings could reasonably have been ascertained before the administrative hearing was made.

18) Mr. Autery was divorced from Janice Autery on March 7, 1989. He had two minor children by that marriage.

19) The court finds that the defendant's negligence caused Ms. Schreiner severe emotional distress and that it was reasonably foreseeable that such conduct would cause her such emotional distress. Ms. Schreiner was in the car when the accident happened. After the accident, she was still conscious and screamed as she saw Mr. Autery slumped over the steering wheel. She testified that she was in love with Mr. Autery and that they had plans to be married. However, she offered no evidence on

the length of the relationship. There is no evidence of any relationship between Ms. Schreiner and Mr. Autery's children. Ms. Schreiner testified that the accident changed her life, caused her to have nightmares, and caused her depression.

20) Nell D. Autery is the administratrix of the estate of Roy Franklin Autery.

## CONCLUSIONS OF LAW

The United States is the defendant in this tort action, and the action arises pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) [hereinafter "FTCA"].

Under the Federal Tort Claims Act, the United States is subject to tort liability "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This liability attaches "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

### *Discretionary Function*

At the close of evidence, the court asked counsel for both sides whether any evidence with regard to the discretionary function exception had been presented at trial that had not been submitted in conjunction with defendant's motion for summary judgment. Counsel for both sides stated that no additional evidence had been presented. After due and proper consideration of the applicable law, the evidence and arguments presented by both sides, and the objections to the Report and Recommendation filed by the defendant, this court adopts the opinion of the Magistrate Judge, as set out below, with regard to the applicability of the discretionary function exception to this case:

Under the doctrine of sovereign immunity, an action may be maintained against the government only if the government consents to suit. *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). The extent of the court's jurisdiction is defined by the terms of the government's consent to suit. *Lehman v. Nakshian*, 453 U.S.

156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). Thus, a plaintiff must comply with the terms of the government's consent to suit, including time limitations.

The Federal Tort Claims Act (hereinafter FTCA) allows waiver of the sovereign immunity of the United States in cases involving negligence by government employees. The FTCA provides for suits against the United States for damages

"for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b). However, this waiver of sovereign immunity is limited by certain statutory provisions. Among these provisions is the "discretionary function" exception, which Defendant asserts applies in this action, thereby divesting this Court of subject matter jurisdiction. *See Zumwalt v. United States*, 928 F.2d 951, 952 (10th Cir.1991). The propriety of the application of this exception is therefore a threshold issue which precedes any further analysis of the Plaintiffs' claims.

The discretionary function exception provides that the United States is not liable for

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

This exception has been the subject of several decisions by the United States

Supreme Court.[2] The most recent decision of the Supreme Court addressing the discretionary function exception is found in *United States v. Gaubert,* —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). In *Gaubert* the Supreme Court determined that certain actions of federal regulators in operating and managing a bank were within the discretionary function exception of the FTCA. In reaching this determination the Supreme Court stated as follows:

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," and "it is the nature of the conduct, rather than the status of the actor," that governs whether the exception applies. The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option to adhere to the directive."

> Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," when properly construed, the exception "protects only governmental actions and decisions based on considerations of public policy."

> . . . .

> [T]herefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulations, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if the regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Id.,* 111 S.Ct. at 1273–74 (citations omitted). Therefore, a court must examine the nature of the challenged conduct and determine if it was "a matter of choice for the acting employee or whether it is specifically prescribed by a federal statute, regulation, or policy. *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function to protect." *Id.* Second, if the challenged conduct is a product of judgment or choice, "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* A discretionary decision is only protected if "based on considerations of public policy." *Id.*

Thus, in the case at bar, the inquiry for this Court is whether the Park Service officials had discretion under their Tree Hazard Management Plan to remove "hazardous" trees and, if so, whether such discretion is the type which Congress intended to shield from liability by virtue of § 2680(a).

It is undisputed by the parties that a hazardous tree plan was in effect at GSMNP at the time of the accident. (*See* Doc. 24) However, it was an unwritten policy or procedure. According to one park employee, this unwritten policy required all employees to report all "known

---

**2.** *See e.g. Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct.1954, 100 L.Ed.2d 531 (1988); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

or potentially hazardous trees to area supervisory ranger or maintenance personnel for timely and appropriate action." (*See* Doc. 42, Ex. E–12, E–13, Ex. H at 6) The evidence presented establishes that the Park Service attempted to establish a written policy regarding hazardous tree management as early as May, 1984 (Doc. 42, Ex. E–12), however, a final draft of the plan was not implemented until June 8, 1990, eleven months after this incident occurred. (*See* Doc. 42, Ex. F) Included in that final draft is a reference to National Park Service Special Directive 76–9 (Health and Safety of Park Visitors, October 5, 1976). The portion of the draft containing this provision provides as follows:

> E. *Tree Hazard Management Policy—Great Smoky Mountains National Park* Recognizing not only a serious problem with public safety, but also a potential for very large tort claims, most government agencies, including some National Park Service areas, have now adopted policies promoting the detection, documentation, removal, and prevention of tree hazards. (6,7,8) Also, each area of the National Park Service has been given the following mandate by NPS Special Directive 76–9 (Health and Safety of Park Visitors, October 5, 1976):

> Protection of the visitor, and park and concessioner employees, from violations of laws and regulations and from hazards inherent in the park environment, is a prime responsibility of the National Park Service. The saving and safeguarding of human life takes precedence over all other park management activities, whether the life is of the visitor, concessioner, or park employee. The Service will work closely with other responsible Federal, State, and local agencies in carrying out this responsibility. (9) Therefore, the policy of the National Park Service at Great Smoky Mountains National Park will be that we will make every reasonable effort within the constraints of budget, manpower, and equipment available to detect, document, remove, and prevent tree hazards, as provided for by this Tree Hazard Management Plan.

(Doc. 42, Ex. F)

Defendant maintains that implementation and execution of the Tree Hazard Management Plan in effect at the time of the incident called for discretionary action, since under the plan an employee must go through a decision-making process before a tree is in fact removed. However, in light of National Park Service Special Directive 76–9, which was apparently in effect at the time of the incident involving the Plaintiffs, there is certainly room to argue whether the decision-making process to remove a hazardous tree was in fact discretionary. Such argument is strengthened by evidence submitted by Plaintiffs that indicates that the Park Service was aware of the hazardous nature of black locust trees several months before the accident occurred. This evidence is memorialized in a memo from Dr. William H. Sites of the U.S. Department of Agriculture Forest Service to Dr. Keith Langdon of the National Park Service at GSMNP. (Doc. 42, Ex. F(a)) In that memo, Dr. Sites makes the following assessment about black locust trees: "Black locust trees are short-lived and due to decay (following borer activity), breakup and drop limbs and tops. Avoid them in new areas; remove them when possible in existing areas."

Therefore, in the undersigned's opinion, the fact that the Defendant chose not to take precautionary measures in regard to black locust trees does not invoke the protection of § 2680(a). Based upon the evidence presented to this Court, no element of choice was presented when the Defendant failed to remove black locust trees which were located within "striking" distance of the park roadway. Since the danger presented by these trees was known by park officials, there was no discretion to fail to take remedial measures. Surely, it cannot be contended that the park officials had discretion to decide whether overriding policy considerations of pro-

tecting the trees and the natural state of the area outweighed the safety of humans using the park roadway. Accordingly, it is the opinion of the undersigned that no reasonable range of choices existed with respect to the Park Services' inaction, and, as such, the discretionary function doctrine of 28 U.S.C. § 2680(a) is inapplicable.

This court further adds that the evidence reflects a failure of duty by failing to take action on known or potential hazards presented by black locust trees under the defendant's long-standing *policy* decision to protect human life first and foremost in the park. It can be argued that the *written* tree hazard plan, not yet adopted at the time of the accident, was a policy decision protected by the discretionary function exception. This court has found a policy to protect human life by removal of tree hazards has been in existence at GSMNP for many years. The maintenance personnel charged with removal of hazardous trees learned of the black locust tree hazard before the accident. The implementation of the long-standing policy decision is not a choice that brings the defendant within the discretionary function exception.

The GSMNP Resource Management Division, which included Mr. Langdon and his superiors who were drafting the written tree hazard management plan, knew or should have known upon receipt of Dr. Sites' warning that the existing policy demanded immediate, positive, aggressive action. Their failure to take such action was not a choice that brought them within the discretionary function exception. In *Gaubert,* the Supreme Court discussed *Berkovitz* and stated:

> We found that some of the claims fell outside the exception because the agency employees had failed to follow the specific directions contained in the applicable regulations, i.e., in those instances, there was no room for choice or judgment.

— U.S. at ——, 111 S.Ct. at 1274, 113 L.Ed.2d at 347.

In the case sub judice, this court finds the defendant's employees failed to follow the directions to protect human life first and foremost.

The Magistrate Judge further stated that:

> Alternatively, assuming *arguendo* that the Park Service was presented with a choice of whether or not to take any action with respect to the black locust tree problem, the undersigned is of the opinion that such choice was not one which Congress intended to be shielded from liability by virtue of § 2680(a). *See United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984) (the ultimate question is whether the challenged acts are of the nature and quality that Congress intended to shield from tort liability). If Congress intended a decision such as the one made in this case to be shielded from liability, then the Federal Torts Claim Act would, for all practical purposes, be a nullity. If Congress intended to protect every such decision, then virtually every plaintiff who has been injured by governmental negligence or wrongdoing will be left without a forum to redress the wrong. Therefore, it is the opinion of the undersigned that Congress did not intend to shield a decision such as the one made in the present case by Park Service officials from liability. Therefore, it is the recommendation of the undersigned that defendant's motion for summary judgment based on the discretionary function exception be denied.

*Standard of Care*

■ Prior to trial the court orally adopted, and has adopted in writing, the recommendation of the Magistrate Judge that plaintiffs be found licensees and not invitees as a matter of North Carolina law. This left the question of the proper standard of care to be applied to this case. The United States contends that because the plaintiffs were licensees, the United States was only under a duty not to willfully injure them or to wantonly or recklessly expose them to danger. The plaintiffs contend that the United States voluntarily assumed a higher duty of care by undertaking a program of tree hazard removal un-

der which the protection of human life was the paramount goal. The plaintiffs argue that the United States assumed the duty to act reasonably.

Numerous courts have found that "[w]hen an agency of the United States voluntarily undertakes a task, it can be held to have accepted the duty of performing that task with due care." *Rogers v. United States*, 397 F.2d 12, 14 (4th Cir. 1968). *See also Neal v. Bergland*, 646 F.2d 1178, 1181–82 (6th Cir.1981), *aff'd sub nom. Block v. Neal*, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983); *Gibson v. United States*, 457 F.2d 1391 (3d Cir.1972); *Creasy v. United States*, 645 F.Supp. 853 (W.D.Va.1986); *Loritts v. United States*, 489 F.Supp. 1030 (D.Mass.1980).

However, because the liability of the United States with regard to the FTCA is determined by reference to "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), whether the United States can be held to have assumed the duty to act reasonably in this case depends first upon whether North Carolina law recognizes the common-law "Good Samaritan Doctrine," whereby "one who undertakes to act, even though gratuitously, is required to act carefully and with exercise of due care and will be liable for injuries proximately caused by failure to use such care." *Creasy*, 645 F.Supp. at 855 (quoting *Neal*, 646 F.2d at 1181–82). *See also Block v. Neal*, 460 U.S. 289, 294 n. 3, 103 S.Ct. 1089, 1092 n. 3, 75 L.Ed.2d 67 (1983).

The Supreme Court of North Carolina has stated on several occasions that "[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence. It is immaterial whether the person acts in his [or her] own behalf or under a contract with another." *Council v. Dickerson's, Inc.*, 233 N.C. 472, 474–75, 64 S.E.2d 551, 553 (1951) (citing Prosser, Prosser on Torts § 33). *See also Toone v. Adams*, 262 N.C. 403, 408, 137 S.E.2d 132, 136 (1964).

■ After consideration of the actions taken by the United States with regard to its undertaking of a program of tree hazard removal that had the safeguarding of human life as its paramount goal, this court concludes that the United States entered upon such active course of conduct. Thus, at the time of the accident here at issue, the United States owed to the plaintiffs the duty to exercise ordinary care with regard to its tree hazard removal policy.

### *The Negligence Claims*

■ It is this court's conclusion that the government was negligent in failing to maintain the area where the accident occurred by failing to identify and remove the hazardous trees that struck Mr. Autery's car. Mr. Langdon, a Natural Resources Specialist at GSMNP, received information from Dr. William Sites about the hazardous nature of black locust trees, and Mr. Langdon communicated this information to his superiors and to various maintenance personnel. Yet the government failed to carry out, in a timely and adequate manner, a practice of identifying and removing trees that were known to be particularly hazard prone from high-density areas such as the area in which Mr. Autery's car was struck.

Furthermore, the defendant was negligent in failing to properly inspect the trees in the area in which the accident occurred. Had the knowledge that several of the maintenance personnel received from discussion with Mr. Langdon been acted upon, the maintenance personnel had sufficient information to make a close inspection of the tree in question, which would have revealed its diseased condition, and to remove it. The failure of the defendant to inspect, identify, and remove the tree that killed Mr. Autery and injured Ms. Schreiner was a failure by the defendant to use due care in the safeguarding of human life by the removal of black locust tree hazards.

Mr. Langdon, his superiors, and several maintenance personnel knew, by reason of Dr. Sites' letter, of the hazards posed by black locust trees. The defendant had notice of the peculiar hazards of black locust trees, but failed to use ordinary care in

safeguarding the lives of park visitors by not taking more immediate, aggressive steps to disseminate this information to employees and by not instituting a program for immediately identifying and removing the hazards that black locust trees were known to pose.

Therefore, the court finds the defendant negligently breached the duty stated in each of the following claims referred to above:

(1) i. Negligently failing to properly maintain the National Park area where the accident occurred by failing to identify and remove the hazardous trees.

The court further finds that the defendant's failure to so act was the proximate cause of the plaintiffs' death and injuries;

(2) vii. Negligently failing to identify and remove the hazardous trees which fell and struck plaintiff's decedent.

The court further finds that the defendant's failure to act was the proximate cause of the plaintiffs' death and injuries;

(3) ii. Negligently failing to properly inspect the trees in the National Park along the area where this accident occurred.

The court further finds that the defendant's failure stated in this claim was the proximate cause of the plaintiffs' death and injuries;

(4) iv. Negligently failing to devise, implement and follow an appropriate tree hazard management plan for the identification and removal of hazardous trees such as the one that fell in this case.

The court further finds that the defendant's failure to act was the proximate cause of the plaintiffs' death and injuries.

Having found the defendant guilty of negligence on four of the seven claims, the court finds it would add nothing to this opinion to discuss the remaining three claims.

### The Wanton Claim

■ The Supreme Court of North Carolina describes wanton conduct as "an act manifesting a reckless disregard for the rights and safety of others." *Pleasant v.*

*Johnson,* 312 N.C. 710, 325 S.E.2d 244, 248 (1985) (citations omitted). "[T]he word 'wanton' implies turpitude, and that the act is committed or omitted of willful, wicked purpose; that the term 'willfully' implies that the act is done knowingly and of stubborn purpose but not of malice." *Wagoner v. North Carolina R. Co.,* 238 N.C. 162, 77 S.E.2d 701, 705 (1953) (citation omitted); *see also Marsh ex rel Marsh v. Trotman,* 96 N.C.App. 578, 386 S.E.2d 447, 448 (1989) (quoting *Wagoner* ); *Nance v. Robertson,* 91 N.C.App. 121, 370 S.E.2d 283, 284 (1988) (quoting *Wagoner* ). "Wanton and willful negligence rests on the assumption that [the defendant] knew the probable consequences, but was recklessly, wantonly, or intentionally indifferent to the results." *Wagoner,* 77 S.E.2d at 706. The court finds that there was no wicked intent or recklessness on the part of the defendant. Therefore, the plaintiffs' wantonness count fails.

### Damages

■ After the plaintiffs' administrative claims were denied, plaintiffs instituted this action. In the amended complaint, Mr. Autery's estate seeks $500,000.00 in compensatory damages on the negligence claims and Ms. Schreiner seeks $500,000.00 in compensatory damages on the negligence claims. The undisputed evidence shows that Mr. Autery's estate suffered damages of $4574.75 in funeral expenses and $572,239.65 in lost income and fringe benefits, for a total of $576,814.40. At the trial, plaintiffs' counsel argued that Mr. Autery's estate should be allowed to recover this total amount. The undisputed evidence shows that Ms. Schreiner suffered damages of $212.30 in medical expenses and $265.00 in related travel expenses, for a total of $477.30.

In their administrative claims, Mr. Autery's estate sought $500,000.00 and Ms. Schreiner sought $50,000. A claimant under the Federal Tort Claims Act is ordinarily restricted in the amount he or she may recover upon a finding of governmental liability to the amount specified in the administrative claim, "except where the increased amount is based upon newly dis-

covered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). Both plaintiffs contend that they should not be limited to the amounts of their administrative claims because of newly discovered evidence of defendant's wantonness. Mr. Autery's estate contends that it should not be limited to $500,000.00 because it did not have available a precise amount of Mr. Autery's future earnings at the time of the administrative claim.

Because of this court's findings that defendant's conduct was not wanton and that Mr. Autery's future earnings could reasonably have been ascertained before the administrative claim, the court concludes that the FTCA bars the plaintiffs from seeking more than the amounts set out in their administrative claims. The court finds that Mr. Autery's estate is entitled to compensatory damages in the amount of $500,000.00.

▉▉▉ To recover for negligent infliction of emotional distress, North Carolina law requires that the plaintiff prove that the defendant engaged in negligent conduct, that it was reasonably foreseeable that the negligent conduct would cause the plaintiff severe emotional distress (often referred to as "mental anguish"), and that the conduct did in fact cause the plaintiff severe emotional distress. *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990). A plaintiff may recover for his or her severe emotional distress arising due to concern for another person if the plaintiff can prove that the emotional distress was a proximate and foreseeable result of the defendant's negligence. *Id.*

▉▉▉ The evidence established that Ms. Schreiner suffered and suffers from severe emotional distress as a result of defendant's negligent conduct. "Factors to be considered on the question of foreseeability in cases such as this include the plaintiff's proximity to the negligent act, the relationship between the plaintiff and the other person for whose welfare the plaintiff is concerned, and whether the plaintiff personally observed the negligent act." *Id.*, 395 S.E.2d at 98. Ms. Schreiner was present in the car when Mr. Autery was killed as a result of defendant's negligence. Ms. Schreiner's testimony demonstrated that they had close emotional bonds. Furthermore, although physical impact and injury are not required elements of the tort of negligent infliction of emotional distress in North Carolina, *id.* at 97, the court notes that Ms. Schreiner was in fact injured by the defendant's negligence. North Carolina law does not require that the plaintiff demonstrate a subsequent physical manifestation of the emotional distress. *Id.* The court concludes that Ms. Schreiner has established by a preponderance of the evidence her case for negligent infliction of emotional distress and finds that she is entitled to $477.30 for her actual damages and $20,000.00 for defendant's negligent infliction of emotional distress.

It is ORDERED, ADJUDGED, and DECREED that Mr. Autery's estate's compensatory damages exceeded $500,000.00 but that Mr. Autery's estate's recovery is limited to that amount by 28 U.S.C. § 2675(b), and the court awards that amount, $500,000.00, to Nell Autery, as administratrix of the estate of Roy Franklin Autery. The court awards Ms. Schreiner $477.30 for her medical and travel expenses and $20,000.00 for negligent infliction of emotional distress.